Filed 2/20/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,              )
                                    )
         Plaintiff and Respondent,    )
                                    )           S122123
           v.                         )
                                    )
ANGELINA RODRIGUEZ,       )
                                    )      Los Angeles County
         Defendant and Appellant.     )    Super. Ct. No. BA213120
_____ )

A jury convicted defendant Angelina Rodriguez of the first degree murder of her husband, Jose Francisco Rodriguez, under the special circumstances of murder by administering poison and murder for financial gain, and of one count of attempting to dissuade a witness. (Pen. Code, §§ 136.1, subd. (a)(2), 187, 190.2, subd. (a)(1), (19).)[1] The jury was unable to reach a verdict on a charge of soliciting murder, and the court declared a mistrial on that count. After a penalty trial, at which the prosecution presented evidence that defendant had murdered her infant daughter several years previously, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# I. THE FACTS

## A. Guilt Phase

### 1. Overview

The evidence showed that in September 2000, on her second attempt, defendant fatally poisoned her husband, Jose Francisco Rodriguez, by giving him drinks containing oleander and antifreeze in order to collect on a life insurance policy she had insisted the two take out a few months earlier. Previously, she had tried to kill him by loosening natural gas valves in their garage. From her jail cell while awaiting trial for the murder, she attempted to dissuade a witness from testifying against her. Evidence was also presented that later she solicited that witness's murder.

### 2. The Events Leading to the Victim's Death

Defendant met her future husband, known as "Frank," in February 2000, while they were employed at Angel Gate Academy (Academy) in San Luis Obispo.[2] The Academy was a partnership program of the California National Guard and the Los Angeles Unified School District which hosted district students at a camp for a month. Defendant described the Academy to police investigators as a "four week boot type camp for troubled youth."

Frank and defendant were married on April 8. Shortly after the wedding, Frank got a job teaching in the Los Angeles Unified School District, and they moved to Montebello. Defendant's then nine-year-old daughter by a previous marriage, Autumn F. (Autumn), lived with them.

---

[2]  Because defendant and the victim have the same last name, we will refer to the victim as Frank to avoid confusion. Unless otherwise indicated, all dates are in the year 2000.

In July, defendant and Frank took out a $250,000 life insurance policy on Frank's life from the Midland National Life Insurance Company. Defendant was named the primary beneficiary. Mickey Marracino, the agent who sold them the policy, testified that defendant had written to him in response to a direct mailing advertisement. He then called her to make an appointment to see them. Marracino met the couple at their home on July 15. Marracino heard Frank ask defendant "why she felt that they needed the insurance" in light of the fact that they were already covered at work and through the National Guard. Defendant explained to Frank the benefits of life insurance and why she felt they needed it. Frank still hesitated, but then told Marracino to "write it up." Frank took the necessary physical examination on July 18, and the policy was approved on July 26. Frank and defendant also discussed insuring defendant's life for $50,000, but that policy was never finalized.

Palmira Gorham, a friend of defendant's during this time, testified that after the marriage, defendant often visited her in Paso Robles without Frank and expressed unhappiness with her marriage. Sometime around mid-June or mid-July, Gorham and defendant had a conversation at Gorham's home in which defendant "was telling me how unhappy she was with Frank." Gorham said jokingly, "Why don't you divorce this one like you divorced all your other ones?" Defendant responded, "No, this one has got [a] life insurance policy," and "[t]hat might be worth my time to do that." She said something like, "If I were to kill him, at least I'd end up with a little bit of money." Later, Gorham's mother joined the conversation, and the two told defendant a story about a woman who had tried to kill her husband by giving him "oleander tea." Gorham did not take the conversation seriously.

A day or so after this conversation, Gorham and her boyfriend spoke with defendant about a dog that had bitten Gorham's son and Gorham's frustration with

3

the police response. At one point, the boyfriend commented that "we could just soak some hot dogs in antifreeze and throw it over the fence." When defendant asked why, Gorham told her "that we had seen something on TV that antifreeze has like kind of a sweet taste and it's really colorful, so it's like bright pink or green, . . . and that children and animals, they would drink it without thinking twice."

A couple of weeks later, when defendant was at her home in Montebello, Gorham spoke with her on the telephone. Gorham heard a blender running in the background and asked what defendant was doing. Defendant responded that "she was making Frank a special milkshake." In the past, defendant had told Gorham that Frank liked to have milkshakes when he was ill. So Gorham asked defendant if Frank was sick. She responded, "Not yet."

Loran Moranes was Gorham's nephew, although he was older than she. He got out of jail on July 17 and began a relationship with defendant that became sexual on August 26. Defendant visited him regularly in Paso Robles, beginning while Frank was still alive. Moranes testified that about a week before Frank died, defendant was with him in Paso Robles. She told Moranes that she had "left some kind of gas on in the garage" in Montebello so that Frank "would die." She said that "either there would be some kind of explosion in the house or he would go in there and pass out."

Because he did not want to get involved, Moranes did not tell investigators about this conversation until July 2001, long after defendant's arrest. When the investigators heard of this, they checked records from Southern California Gas Company, the company that serviced defendant's home. The records showed that on September 3, the Sunday of Labor Day weekend, Frank had reported a gas leak at his and defendant's Montebello home. Luis Aguilar, a company service technician, responded to the report and spoke with Frank. Aguilar found two gas

4

leaks in the garage, one behind the clothes dryer and one on the water heater. The valve fitting on the dryer was "very loose," which would not have happened on its own.

On Tuesday, September 5, the day after Labor Day, Frank traveled by bus to Angel Gate Academy as chaperone for students from his school who were to participate in the program there. After dropping the students off at the Academy, Frank returned home the same day. He had been a late addition to the group of teachers who accompanied the students, and his name was not placed on the list of teachers who were coming that was given to employees at the Academy.

On Thursday, September 7, Frank, accompanied by defendant, went to the emergency room at Kaiser Hospital in Baldwin Park complaining of vomiting and diarrhea. The treating physician diagnosed the cause as food poisoning. Defendant voiced no suspicion that Frank had been intentionally poisoned. The doctor discharged Frank that afternoon. When he did so, he wrote on a standard instruction sheet that Frank should drink a lot of fluids and, specifically, "drink Gatorade as a re-hydration." Defendant signed the instructions, indicating that she had received them.

### 3. *The Victim's Death and Aftermath*

At 3:19 a.m. on Saturday, September 9, Montebello Police Officer Stephen Sharpe, responding to a call from defendant's home at 837 Marconi Street, found Frank's body lying facedown on the carpet in the bedroom. He observed blood on the carpet that apparently came from the victim's nose but could detect no apparent cause of death. Defendant identified the man as her husband. Officer Sharpe testified that defendant's crying "seemed rehearsed or kind of forced"; "[a]lthough it was audible, the crying noise, there was a lack of tears, and as soon as I would talk to her, ask her a question, she would immediately kind of snap out

5

of it and answer the questions real quick, and in my experience . . . usually someone who just lost their husband, they're very difficult to speak with and communicate to."

The initial autopsy did not reveal the cause of death. The body contained no sign of trauma. Frank was 41 years old when he died and had been in generally good health.

At 10:17 a.m., the morning Frank died, defendant called Marracino, the life insurance agent, and left a message for him to call her back. When he returned her call a short time later, she reported her husband's death and inquired about getting the $250,000 payment on the policy on Frank's life. Marracino informed her that the company would need an official death certificate showing the cause of death. He also explained that when the death occurs during the first two years after the policy was issued, the company will investigate the claim to determine if it is legitimate. During the conversation, Marracino noticed that defendant spoke without emotion. "It was sort of matter of fact the way she was talking to me and explaining everything. She didn't cry, she didn't hesitate in any way, she didn't lose any train of thought . . . ."

Marracino reported Frank's death to the insurance company the same day. He had several other conversations with defendant over the next few weeks in which she repeatedly asked when she would get paid. He kept advising her the company needed a cause of death.

Rebecca Perkins, Frank's sister, who lived in Florida, learned of Frank's death from her mother, Janet Baker. Around noon the day of his death (9:00 a.m. California time), she telephoned defendant and asked what had happened. Defendant responded, "He drank too much." Perkins was surprised because Frank did not drink alcohol. Defendant went on to say that Frank had been sick on

6

Wednesday and Thursday, and she took him to the hospital on Friday. She said Frank had died of a "stomach infection."

A short time after this conversation, Perkins called defendant again. This time, defendant told her that "the people at the Angel Gate Academy gave him cookies and Gatorade and that killed him." She also said "that she thought it was the people at Angel Gate this time who had killed him, and months ago in June that it was the students at his middle school that had tried to poison him." Regarding why someone at Angel Gate Academy would want to kill Frank, defendant said "that she was terminated and she left on a bad note and therefore they didn't like Frank and so they wanted to kill him." Perkins testified that during both of these conversations, defendant "had no emotion."

Frank's other sister, Shirley Coers, spoke with defendant the day after his death. Defendant said she "wanted to cremate him and sprinkle his ashes on a beach that she said was their favorite place to go." Later defendant told her that Frank might have a military burial. In another conversation, defendant told Coers that an officer at Angel Gate Academy had killed Frank when Frank had gone there for a meeting. She said the officer "put some kind of poison in his cookies and Gatorade." Coers asked defendant how someone could poison another person. Defendant said there are many ways; for example, one can make a tea with oleander. On Tuesday, September 19, Coers drove with defendant and others in a limousine to Frank's funeral. On the way, defendant pointed at some bushes on the side of the road and said, "That's oleander."

Elaine Nash, an employee with the Midland National Life Insurance Company, spoke with defendant several times, beginning on September 28, regarding defendant's efforts to collect the insurance money. Nash told defendant the company needed a death certificate stating a cause of death, and it would take about four to six weeks to process the claim after they received the certificate. She

7

also explained that the company would conduct its own investigation because the death had occurred within two years of issuing the policy. Defendant told her the autopsy was being done but the toxicology had not been completed. Later, defendant asked Nash to fax her the claim forms. Nash said she could not do so in the case of a contested claim. Nash also declined defendant's request to verify to a real estate agent that the funds would be available so she could buy a house. The company never paid the insurance benefits.

### 4. *The Investigation*

Montebello Police Detective Gregory Wilsey was the original investigator into Frank's death. On September 11, the Monday after Frank died, he received a telephone call from defendant asking about the coroner's office and how it would dispose of the body. He told her that the coroner had not determined the cause of death, and any information they could receive regarding what Frank might have ingested would help to narrow the possibilities. She told him that she believed someone at Angel Gate Academy in San Luis Obispo might have poisoned him. She said that "earlier that year that they had . . . blown a whistle on somebody who had committed — suspected of child abuse on one of the students or children up there, and because of that some people got fired, some people got reassigned and she felt that there was some animosity towards her husband over that." She said Frank had gone to the Academy some days before his death to chaperone disadvantaged youths who were going there. During this conversation, Detective Wilsey was struck by defendant's lack of emotion.

On September 14, the case was referred to the Los Angeles County Sheriff's Department and assigned to Detective Brian Steinwand and Sergeant Joe Holmes. Detective Steinwand testified that defendant had been a suspect in Frank's death from the beginning, but they did not tell her that. They pretended to

8

believe her story that someone at Angel Gate Academy had poisoned Frank in order to try to get her to talk and provide information. In fact, they never suspected anyone at the Academy of poisoning Frank. Beginning on September 14, the investigators had numerous conversations with defendant that they surreptitiously tape-recorded. Relevant portions of several of the conversations were played to the jury.

Defendant told the investigators she believed a man at Angel Gate Academy named Charles "Chad" Holloway had poisoned Frank. She said that she and Frank had blown the whistle on Holloway for inappropriate behavior with some of the students at the Academy. She said that on September 5, Frank had gone to the Academy as a chaperone. When he returned home, he told her that someone there had given him Gatorade and cookies. Defendant also talked about the life insurance policy and said that the company would not pay the claim until it had been advised of the cause of death. She asked if the investigators could help get the coroner's office to do what was necessary to determine a cause of death so she could receive the money.

On September 26, Janet Baker, Frank's mother, informed Sergeant Holmes that defendant had said something about oleander. This was the first mention of oleander as a possible poison in the case. Detective Steinwand informed the coroner's office of the possibility of oleander poisoning. However, no test for oleander was conducted at that time, apparently because very few laboratories can perform such a test. A large oleander bush, easily accessible to defendant, grew over the fence in the backyard of her Montebello home.

During this time, defendant frequently asked the investigators about efforts to determine a cause of death because she wanted to collect the insurance money. The investigators explained that the coroner's office had been unable to determine the cause of death, and that they needed to know what to look for as a possible

9

poison. As a ruse, they stressed that it would be very useful to know what the poison might have been.

On October 19, before 9:00 a.m., while driving, Sergeant Holmes received a call on his cell phone from defendant's cell phone. Defendant told him she had just received a telephone call. (Telephone records later showed that, in fact, defendant had not received any incoming telephone call on her cell phone that morning, before she called Sergeant Holmes.) Sergeant Holmes told her he would call her back. He did so when he returned to his office so he could record the conversation. Defendant told him that shortly after 8:00 a.m. that morning, she had received a telephone call while she was driving from a man who refused to give his name. She said the "caller ID" was blocked. The man told her he had talked with Holloway. Holloway had told him, "they can't pin me." The man also said, "Ask them about antifreeze." Defendant did not know how the man had gotten her cell phone number.

This was the investigators' first information that antifreeze might have been involved. After this conversation, Sergeant Holmes asked the coroner's office to check for antifreeze as a possible poison.

Dan Anderson, a toxicologist with the Los Angeles County coroner's office, testified that the results of the initial tests on Frank's body had been negative except for the presence of Vicodin. That created a problem, because when checking for the presence of drugs, one must look for something specific. There is no general toxicology test for everything. If a test for the most common drugs is negative, trying to determine what might be present is like "looking for a needle in a haystack." For example, one must look specifically for ethylene glycol, the main chemical component of automotive antifreeze, in order to find it.

After defendant mentioned antifreeze to the investigators, specimens from Frank's body were examined for ethylene glycol. All samples showed the

10

presence of a fatal amount of that chemical. Later testing also showed the presence of oleander.

Dr. Richard Clark, a toxicologist with the poison center at the University of California, San Diego, testified that ethylene glycol is poisonous but tends to taste sweet and can easily be mixed with Gatorade. Oleander, commonly found along Southern California freeways, is also poisonous. It can be served as a tea and mixed with another liquid to disguise its bitter taste.

After examining documents in the case, Dr. Clark opined that Frank had died of ethylene glycol poisoning. Specimens from his body contained five and six times as much of the chemical as is needed to kill. Frank would have had to receive the fatal dose within 24 hours before his death and "most likely" within six to seven hours. After reviewing records from Frank's September 7 visit to the hospital, Dr. Clark opined that Frank could not have had in his system at that time the ethylene glycol that his body later contained. Frank's symptoms at that visit were consistent with oleander poisoning. Dr. Clark testified it is "hard to say" what role the oleander played in Frank's death, although it could have "played a part." Frank must have last ingested oleander within 24 hours before his death.

Dr. Ogbonna Chinwah, who had performed the original inconclusive autopsy, testified that he later reexamined the body and found evidence of ethylene glycol in the kidneys. In his opinion, Frank died of ethylene glycol and oleander poisoning.

On December 12, Detective Steinwand told defendant that he was going to question Holloway about the case. He did in fact speak with Holloway, but only to obtain his cooperation and not as a suspect. He arranged for Holloway to telephone defendant with the investigators surreptitiously listening. The next day, December 13, Holloway called her. Acting pursuant to instructions, Holloway

11

asked her why she had told the "police that I poisoned Frank with antifreeze." Defendant replied that he needed to talk with the investigators.

About one minute after this conversation ended, Sergeant Holmes received a "911 page" (meaning important) from defendant. He called her back. She told him she had just received a call from Holloway in which he said, "Well, they'll never be able to — to catch me anyway," and "You better watch you [*sic*] back." In fact, Holloway had said nothing like that to her. Recordings of both December 13 conversations were played to the jury.

In December, the investigators informed defendant of the results of the antifreeze testing. In various conversations, defendant asked the status of the investigation regarding Holloway. As a ruse, the investigators told her that one weakness in their case against Holloway was the lack of evidence that Holloway had known in advance that Frank would be coming to Angel Gate Academy on September 5. Poisoning requires advance planning, they explained, and Holloway could defend against a poisoning charge by claiming he had not known Frank would be there that day. They stressed that it was important for them to obtain evidence that Holloway had received information in advance that Frank would be there.

On January 19, 2001, Sergeant Holmes told defendant that oleander had been found in Frank's body, and that the cause of death and death certificate would be ready in a few weeks. Defendant asked if they had yet received any evidence that Holloway had known in advance that Frank was coming to Angel Gate Academy on September 5. He told her they had not. She told him that when she worked "at admin," she always received a fax saying who was coming.

On February 5, 2001, Sergeant Holmes received an anonymous fax addressed to him at the homicide bureau. It contained no cover sheet and indicated it had been sent from Staples Store No. 702. On the first page was

12

written, "Urgent. Detective Holmes, I mailed this to you. Why is Chad still free? Thought maybe you did not get it. Here it is again." The name "Chad" obviously referred to Holloway. The next two pages appeared to be a printed document concerning a faculty orientation at Angel Gate Academy. On the second of these pages was the handwritten name "F. Rodriguez."

Later, Sergeant Holmes received in the mail at work an envelope containing a copy of the same document he had received by fax on February 5, 2001, and a note stating, "I found this in second platoon's locker, in Sergeant Holloway's papers. I figured this is how he knew Sergeant Rodriguez was coming to SLO [San Luis Obispo]. I hope this helps fry the bastard."

On February 6, 2001, the investigators drove to Paso Robles, where defendant had moved after Frank's death, intending to arrest her. While driving, they received a page from her. Sergeant Holmes called her back. He told her about the fax he had received and said it was important for them to know who had sent it. She said she knew nothing about it. She also asked whether they were going to arrest Holloway. She added that she would like to be present when they did, "to see the expression on his face."

After defendant's arrest, the investigators searched her Paso Robles home pursuant to a search warrant. They found in her purse a piece of paper containing numbers and computations, apparently calculations regarding how she would spend the insurance money plus accumulated interest that she expected to receive, and a napkin on which was written the sheriff's fax number, the number to which the anonymous fax received by Sergeant Holmes had been sent.

The purse also contained a fax confirmation sheet from Staples Store No. 702 and the original of the fax Sergeant Holmes had received on February 5, 2001. On this original copy, however, the handwritten name "F. Rodriguez" was in red.

13

A forensic document examiner testified that this name was written in original red ink and was not a copy from some other document.

The Los Angeles school administrator who coordinated the Angel Gate Academy program testified that normally the school district would not provide the Academy with the names of teachers who merely accompanied the students to San Luis Obispo and returned the same day. She said the printed document in the fax Sergeant Holmes had received concerned a session that started on September 5. It contained the names of the teachers who would stay there but not of those who just rode the bus. The printed document would not normally contain a handwritten name like the one on the fax.

### 5. *Defendant's Arrest and Later Events*

Detective Steinwand and Sergeant Holmes arrested defendant for Frank's murder on February 7, 2001.

Evidence, including a tape-recorded telephone call that defendant made to Gorham on March 27, 2001, showed that, while in jail awaiting trial, defendant tried to dissuade Gorham from testifying against her. In the recorded conversation, defendant told Gorham that, based on what Gorham had told the investigators, she could be considered an accomplice in the case. She suggested that Gorham might be arrested if she did not change her story. Gorham responded that if she changed her story, "isn't that just gonna make it look worse?" Defendant said that people "retract it all the time." She said Gorham could say she had "found me with Conrad" (Gorham's boyfriend). She added, "That would be enough for you to snap." She also said that "this is getting bigger than anybody can imagine, and it doesn't need to be. Do you see what I'm saying?" She reiterated that Gorham "knew what I was doing, and you didn't stop me." When

14

Gorham noted that she had not been arrested, defendant said, "They're still investigating," and "They're still asking a lot of people questions."

Other evidence showed that in May 2002, while still in jail awaiting trial, defendant tried to solicit fellow inmate Gwendolyn Hall to arrange Gorham's murder when Hall was released from jail. Defendant first offered to pay $20,000 for Gorham's murder then increased the offer to $30,000.

### 6. *Defense Evidence*

Defendant cross-examined prosecution witnesses and, through stipulation, presented evidence regarding telephone calls between defendant's home and Gorham's home during the Labor Day weekend of 2000. The apparent purpose of the stipulations was to impeach parts of Loran Moranes's testimony.

## B. Penalty Phase

### 1. *Prosecution Evidence*

The prosecution presented evidence that defendant murdered her infant daughter in 1993 and additional evidence that she solicited Gorham's murder.

### a. *Death of Defendant's Daughter*

On September 18, 1993, defendant's 13-month-old daughter Alicia F. (Autumn's younger sister) choked to death on a pacifier manufactured by the Gerber Products Company (Gerber) in her crib in the family's home in Lompoc. Defendant's husband at the time, Thomas F. (Thomas), Alicia's father, was on a business trip, and defendant was the only adult in the house when Alicia died.

Santa Barbara County Firefighter David Mandeville was the first to respond to an emergency call at defendant's home just before noon that day. When he arrived, defendant was waiting for him outside. Mandeville found this unusual because normally regarding calls "where a child or infant is choking, the parents are with the child." Alicia was in her crib not responding. He found a piece of

15

plastic in the baby's throat and, with an effort, was able to "pop it out." The plastic was the rubber nipple part of a pacifier. Mandeville unsuccessfully applied cardiopulmonary resuscitation to try to revive the baby. He turned the baby over to paramedics as soon as they arrived.

Deputy Sheriff Ralph Ginter responded shortly after Mandeville. He found the plastic backing of the pacifier in the crib and the rubber nipple on the floor. He accompanied defendant to the hospital. After defendant was told that her baby had died, she asked to obtain the pacifier backing, saying "that she wanted to keep it, that the manufacturer or company that she purchased it from is going to pay, and she didn't want this to happen to another child." Deputy Ginter wrote in his report at the time that defendant was "adamant" about wanting to obtain the pacifier backing. He released it to her at the hospital.

Dr. Wallace Carroll, the pathologist who presided over the autopsy, testified that Alicia died of "asphyxiation due to airway obstruction," that is, she choked to death. Alicia had two teeth — the two lower front teeth.

Two months before the baby died, defendant had insured the baby's life for $50,000, and named herself as the primary beneficiary. Defendant did not name Thomas as a beneficiary and did not tell him about the policy until after the baby had died. On October 22, 1993, the insurance company paid the $50,000, plus interest.

Thomas testified that in late 1992 or early 1993, while vacationing in Michigan, he and defendant were eating in a restaurant with their daughters. Another customer noticed the pacifier in Alicia's mouth and "said that she wanted to let us know that she was pretty sure that that pacifier was part of a recall." In fact, in March 1993, Gerber had voluntarily recalled the pacifier on which Alicia choked based on five consumer reports that it had separated into three pieces.

16

Shortly after Alicia died, Thomas and defendant consulted a local attorney about suing Gerber. Ultimately, they retained Attorney Barry Novak to represent them. Novak filed a lawsuit on their behalf against Gerber for Alicia's wrongful death due to the failure of the company's pacifier. He obtained the actual pacifier, which was in two pieces. Novak sent both pieces to Dr. Wolfgang Knauss, a professor at the California Institute of Technology (Caltech), for examination. Dissatisfied with Dr. Knauss's report, he next sent the pieces to Dr. Gary Hamed, a professor at The University of Akron, for a second opinion. The defendant in the lawsuit, Gerber, never learned of Dr. Knauss's opinion.

In March 1996, after defendant and Thomas had divorced, Gerber settled the lawsuit by paying $710,000. Defendant received 60 percent and Thomas 40 percent of what remained after deducting Novak's fee and expenses. Defendant received more than Thomas because she had been present at Alicia's death and suffered emotional trauma.

When Detective Steinwand searched defendant's home after her arrest, he found a copy of Dr. Knauss's report containing the results of his examination of the pacifier. As a result of this discovery, Detective Steinwand investigated further into the circumstances of Alicia's death.

Dr. Knauss testified as an expert regarding the "failure and fracture of polymers, which includes rubbers." In 1994, Barry Novak asked him to examine the two pieces. He did so and prepared a report containing his findings and opinion. At trial, Dr. Knauss described the two pieces he examined. "A pacifier is typically made up of what one . . . calls the shield, which is the hard part that stays in front of the mouth. Then something some people refer to as the baglet or the nipple, which is in the baby's mouth, and the nipple is characteristically out of a natural clear looking rubber, and in this case the nipple part had broken off away from the hard part, the shield, close to the shield." Specifically, the separated

17

nipple had "broken off or torn off" from part of the nipple that remained attached to the shield. The distance from the shield to the point of the rupture, where the separated nipple had torn away, was short, approximately two or three millimeters.

In Dr. Knauss's opinion, the fracture he observed between the two pieces could not have been caused either by a baby chewing through the pacifier or a baby's repeated sucking action. He based this opinion on the nature and pattern of the tear, the amount of force necessary to cause it, and the fact the tear was near the shield rather than on some part of the nipple a baby would actually touch. Based on his visual and microscopic examination of the pacifier, he believed that "some external trauma or tool was responsible for failing this nipple." One possibility was "something rolling over this, some external agent that caused large force in that region, that would be responsible for this kind of complex fracture pattern." He said, "it might happen when a chair or some hard object rolls over the pacifier like this. That might be the cause." A tool such as pliers could also have caused the tear.

Dr. Knauss was aware that Dr. Hamed believed the nipple might have had an initial cut that a baby's normal use could have exacerbated, causing the rubber's complete separation. Dr. Knauss believed this was not possible due to the large amount of force that would have been needed to cause the separation. In his opinion, "the ultimate failure as it now appears and documented in these photographs is not consistent with that scenario."

The prosecution presented portions of defendant's deposition testimony in the lawsuit against Gerber. She testified that she had checked the pacifier when she first received it to "ma[k]e sure there's no cracks or evidence of wearing." About once a week she tested the pacifier's bulb by pulling on it.

18

### b. Solicitation of Murder While in Jail

The prosecution played for the jury tapes of jail conversations between inmate Gwendolyn Hall and defendant on May 10 and 11, 2002, that were recorded with Hall's cooperation, in which defendant solicited Gorham's murder.

In the May 10 conversation, defendant told Hall "they could do it one of two ways. They could do it robbery gone bad, or they can make it look like a boyfriend gone mad." Defendant gave Hall the address of and directions to Gorham's home in Paso Robles. When Hall asked how she would be paid, defendant responded that "this is one thing I'm trying to figure out, the best way to, you know to transport or transfer it because I don't want it to look . . . all of a sudden 25 grand is out my account." She said she was considering "taking a trip to Vegas" because "that would easily show why I would pull out that much — kind of money." Defendant added that the "house is so old that if it blew up, from a gas leak or something, it wouldn't surprise anybody." She also said that "for somebody to go in and shoot them in the head while they're sleeping would not be . . . surprising." A pillow could be used to "muffle[] the sound." She said there is an alley behind the house they could use to get away. Hall and defendant agreed that when the job was finished Hall should send defendant a "little girl card" signed "happy birfday, love, Cuz." (The misspelling was intentional so the message would be clear.)

In the May 11 conversation, defendant asked Hall whether "these guys" would be "bright enough" to figure out how to make it look like a suicide. She discussed other ways to kill Gorham, such as "doing an overdose," using cyanide, or making a gunshot "look self-inflicted." She suggested that Hall drive because "they need a brain." "They're going to have to have somebody to tell them go do this." She added, "It's your investment. Put it that way. It's your decision." They again discussed how Hall would be paid. Defendant also suggested they go

19

to Gorham's house in the morning and watch her leave to "take her kids to school." "This way when she comes back you know she's by herself."

Los Angeles Sheriff's Detective Patrick Valdez, who was assigned to investigate this matter, had heard from Hall that defendant might also be soliciting others to kill Gorham. Anxious to prevent Gorham's murder, he decided to try to convince defendant that the murder had been accomplished. On May 21, 2002, he instructed Hall to tell defendant that she had found someone to "act as a middleman between the hit man and Hall." He gave Hall the fictitious name of "Antonio Davis" as the middleman with a fictitious address. That same day, defendant released $60 from her jail account to "Antonio Davis."

At Detective Valdez's direction, Detective Steinwand and another officer drove to Paso Robles where, with Gorham's cooperation, they took photographs of her apparently dead body with a fake gunshot wound in the head and fake blood. Detective Valdez also arranged to have Detective Jose Mejia, posing as Antonio Davis, the fictitious middleman, speak with defendant at the jail on June 8, 2002. The approximately half-hour interview was videotaped and played to the jury.

In the jail conversation, defendant and Detective Mejia (posing as Antonio Davis) sat divided by a plexiglass window and spoke through a telephone. In addition to speaking with one another, they communicated by writing notes and displaying them through the window, something jail inmates often did because they knew their conversations might be monitored. Defendant wrote separate notes on a single sheet of paper that she folded so that only one note at a time could be read.

Detective Mejia showed defendant two photographs of Gorham's apparently dead body. He then held up a note saying, "How do you want to take care of it? These guys are asking about the money." Defendant wrote a note back saying, "I thought Gwen [obviously Gwendolyn Hall] stopped it." Then she

20

displayed a second note saying, "My star witness." Later she wrote, "Best friend of 6 years." Verbally defendant stated, "This is what I told her." She then displayed a note saying, "When out as soon as insurance in —About 45 days I give to Gwen." Later, she verbally stated, "I think that's about as long as it takes," and displayed another note saying, "It's up to how long insurance takes." Defendant displayed another note saying, "I thought she was joking," then showed again the note saying, "My star witness."

After the conversation, defendant was searched, and the piece of paper on which she had written the notes was seized. An address book containing Antonio Davis's fictitious address was also found in her possession.

### 2. *Defense Evidence*

Defendant presented evidence of two kinds: (1) evidence intended to cast doubt on whether she had murdered her daughter and (2) evidence in mitigation.

Dr. Gary Hamed testified as an expert on "fracture adhesion of rubbery materials, particularly a natural rubber." In 1995 or 1996, he tested the two pieces of the pacifier in the wrongful death case at Attorney Novak's request. In his opinion, the rubber would not have failed as it did if it had not already been "degraded in some way." He believed that three of the baby's forces could have combined to cause the pacifier to fail completely: sucking, a clamping and pulling, and the work of the teeth. Dr. Hamed disagreed with Dr. Knauss's contrary opinion.

Autumn, defendant's daughter, testified, "I would like it for you [the jury] not to execute [her mother] and make it so I can see her."

Anita Rivera, defendant's mother, and Gigiana Colaiacovo, her older sister, testified about defendant's unhappy life and family background. Colaiacovo testified that her grandfather had sexually molested her. When she refused his

21

later advances, it appeared he molested defendant instead. Colaiacovo said, "My sister is a good person." Both witnesses asked the jury to spare defendant's life so they could continue to have a relationship with her.

A defense investigator testified about the defense's failed efforts to interview and obtain the cooperation of defendant's father in New York.

Dr. William Vicary, a psychiatrist, testified about defendant's mental state. To prepare his evaluation, he interviewed several people, including defendant's mother, sister, and cousin, and defendant herself. Defendant described to him sexual abuse she had suffered from various people, including her grandfather. Based on these interviews, Dr. Vicary believed defendant was a victim of sexual abuse, and that this abuse had had a major negative impact on her. He also testified that he had found defendant "to be the most emotional and the most animated when she was talking about her children. She said in all her life, none of her relationships had ever worked, and that she had only two happy experiences, the birth of her two little girls." History that her relatives supplied indicated that "defendant was a very attentive, loving, supportive mother." In Dr. Vicary's opinion, defendant "would be a model prisoner who would get along with the guards and the other prisoners in the institution."

## II. DISCUSSION

### A. Pretrial Issues

Defendant raises several issues regarding primarily pretrial events.[3]

---

[3] As will be seen, even though these are primarily pretrial issues, some of the events petitioner cites occurred during and after trial. For convenience, we will consider all of the related facts and arguments together.

22

### 1. Factual Background

Defendant was arrested on February 7, 2001. On February 27, 2001, the court appointed the public defender to represent her. On April 17, 2001, the superior court issued orders terminating defendant's telephone privileges in jail and ordering the sheriff's department to monitor her visits. The order was based on a declaration by Detective Steinwand providing information about defendant's attempts to dissuade Gorham from testifying, including her tape-recorded call to Gorham on March 27, 2001. On April 24, 2001, the court ordered the sheriff to allow defendant's attorney to have face-to-face interviews with her and to play tapes of recorded conversations and interviews regarding the case. On April 26, 2001, the court also ordered the sheriff to provide to defendant "a set of thermal underwear which is to cover her upper and lower body, in order to help prevent further coughing and colds."

On September 26, 2001, defendant retained Attorney M.R. Ward to represent her in place of the public defender.

Later defendant moved to lift the telephone restrictions. On December 14, 2001, the eventual trial judge, the Honorable William R. Pounders (who was to preside over all further proceedings in the case), conducted a hearing on the motion. Defendant said she was "seeking replacement counsel" and needed telephone access. The prosecutor stated that, due to defendant's "misuse of the phones in the past, she has been placed in a part of the Twin Towers jail facility where she has no access to telephones." Defense counsel requested an order permitting defendant limited telephone access to her lawyer. The parties discussed whether the sheriff's department had the resources to permit defendant to call her lawyer while ensuring that she would not be able to use the telephone to speak with others. While recognizing the need to prevent defendant from continuing to dissuade witnesses, the court stated, "I think the first choice though is, as you

23

[defense counsel] said, to try to reestablish communication between defendant and counsel."

Defendant personally reiterated that she needed telephone privileges to find a new attorney. The court responded, "It isn't necessary right now, but again if you think I'm going to be stupid enough to reestablish your ability to call witnesses and threaten them, I'm not going to do that . . . . You do now have counsel that — of your choice, and there are ways to arrange to have counsel represent you." Defendant also complained about where she was being housed in the jail. The court responded, "I'm going to let your attorney work out that, if that's a problem. I'm not in a position to tell the sheriff how to run the jail . . . . I'm not going to jump in here and at your word decide that I'm going to change your housing and give you free access to the telephone." The prosecutor offered to check with the sheriff's department to see if it could permit defendant telephone access to her attorney while ensuring she could not speak with others.

The court said it believed defendant had the right to call her attorney but "under whatever conditions we need to assure that there's no third party switch." The court left it to the parties to "work that out." In the meantime, the court signed an order allowing defense counsel "to have face to face interviews with [defendant] and to play on a tape recorder, tapes of recorded conversations and interviews pertaining to" the case.

On January 3, 2002, defendant wrote a letter to the court stating that she had "removed" Ward as her attorney and had not yet obtained a new attorney, and asking the court to grant her "temporary telephone access" so she could find another lawyer. The court conducted a hearing on January 16, 2002. At the hearing, Attorney Ward stated his understanding that defendant "was considering to seek other counsel." But he also advised her "that I consider it my obligation to continue working on the case until I'm relieved." He said there were matters

24

concerning witnesses "that I would definitely keep working on until such time that I feel that I'm terminated on the case." Defendant reiterated that she wanted to look for a new attorney. The court expressed willingness to allow defendant to change attorneys if she wished. But it was reluctant to lift the telephone restrictions due to concerns she would use the telephone to dissuade witnesses. It noted that she was already charged with using the telephone to attempt to dissuade a witness.

A jail official stated at the hearing that it was not reasonably feasible to permit defendant to call a particular person while ensuring she did not call someone else. He said, "there's no way for us to set it up where . . . she wouldn't be able to manipulate it and be able to call someone else or get on a three way conversation." The court explored the possibility of alternate procedures to permit defendant some telephone access. But ultimately, based on these representations, the court denied defendant's request to lift the telephone restrictions. The court observed, "It really means that counsel has to visit his client much more frequently at the jail, which I know is a burden, but I also know the security problems." The court also noted that Ward "must remain on the case until relieved by the court, even if your client says otherwise." Attorney Ward agreed to continue to represent defendant unless and until she obtained a new attorney.

At the end of the hearing, the court stated its intent to schedule another hearing for March 13, 2002, if defendant agreed to waive time in which to be tried. It explained, "that gives you more time to make a decision about your attorney." Defendant agreed to waive time. She expressed no objection to Ward's continuing representation under the circumstances. Additional hearings were held on March 13, April 25, and June 17, 2002, during which Ward actively represented defendant. The question of replacing Ward did not arise at these hearings.

On June 24, 2002 (i.e., 16 days after the videotaped meeting in jail between defendant and Detective Mejia, posing as the fictitious middleman Antonio Davis), defendant sent to the court a long letter containing a wide range of complaints about her confinement.

On August 1, 2002, Attorney Ward moved to be relieved as attorney of record due to "defendant's total lack of cooperation in the preparation for trial, and her totally uncalled-for misbehavior while in jail." The court conducted a hearing the same day.

The court explained to defendant that if it allowed a change of counsel, her options would be to hire her own new attorney or, if she could not do that, it would appoint an attorney to represent her. Defendant mentioned, and the court agreed, that a third alternative would be for her to represent herself. The court explained to defendant the process involved in selecting qualified court-appointed counsel. The parties also discussed possible difficulties in allowing defendant access to a law library if she represented herself. The district attorney noted that defendant had been "in administrative segregation initially because she telephoned a witness and attempted to intimidate that witness and now the reason she's there has been reinforced by virtue of the fact that she solicited the murder of that same witness." The court stated its belief that defendant would have access to a law library if she represented herself, but it noted other difficulties that would be inherent in defendant's representing herself. It provided defendant with written information "that talks about the privileges that you do have representing yourself and the limitations on it." The court continued the matter to let defendant consider her options. It ordered Ward to continue to represent her in the interim.

At the next hearing on August 13, 2002, defendant stated she wanted appointed counsel. Both the public defender and the alternative public defender announced that conflicts prevented them from representing her. The court relieved

26

Ward as defendant's attorney and said it would appoint an attorney who was qualified to try a death penalty case. After consulting with the assistant supervising judge, it appointed to represent her the next attorney in line on the list of available attorneys. On August 16, 2002, the court noted that that attorney was on vacation and instead appointed Michael Yamamoto to represent defendant.

On August 22, 2002, Attorney Yamamoto moved to withdraw as defendant's attorney, stating, "I am unable to establish an attorney-client relationship with Ms. Rodriguez, based upon what communication has already taken place." He also stated, "Ms. Rodriguez has indicated that another panel attorney would be preferable to her and that this issue is with me, not appointed counsel." A hearing was held on August 28, 2002. The court stated to defendant that "what I cannot let you do is continue to reject attorneys until you find one that pleases you the most." It noted that "you didn't like the public defender that did your prelim. You didn't like your own attorney that you hired and now you've created the situation in which Mr. Yamamoto feels he cannot adequately represent you." It informed defendant that she could not continually change attorneys, and that at some point she would "be stuck." The court relieved Yamamoto as attorney of record and referred the matter to a bar panel to select a new attorney to represent defendant. David Houchin, defendant's eventual attorney at trial, was appointed to represent her.

At a hearing on November 7, 2002, Houchin informed the court for the record that defendant had just given him a letter from her previous attorney, Ward, postmarked August 7, 2002, that, according to defendant, she had just received the day before. The letter was stamped that it had been opened in error on August 14, 2002. Houchin described it as "a three-page single-spaced letter, which contains some very interesting facts about this case. I know that we had problems down at Twin Towers [the jail facility where defendant was housed] with respect to people

27

getting information about this case or having information about this case, perhaps statements made by my client. I just want to put that on the record that this thing has been circulating." On inquiry from the court, Houchin stated the letter "is a discussion from her prior counsel as to the case, as to how he anticipates that it could or should proceed, and some steps that she should perhaps consider taking." The court asked whether Houchin wanted the letter made part of the record under seal. Houchin responded that he would "be the custodian of the document."

The prosecutor assured the court and defense counsel that he had not seen the letter. Houchin responded, "I think my concern is perhaps informants popping up." The court noted, "There is nothing much we can do with it at this point. Obviously, it stayed there far too long before it arrived with Ms. Rodriguez. Mr. Ward was her retained counsel." It instructed Houchin to "maintain the record . . . . If there is a problem, we'll need to examine what's in the record to see if that could generate the problem that might come up." The record contains no other reference to this letter.

In August 2003, about a month before trial began, Houchin moved the court to modify the order restricting defendant's telephone privileges to permit her to call him. A hearing was held on August 22, 2003. The district attorney expressed no objection to modifying defendant's telephone restrictions as long as the order permitted defendant only to call Houchin and not anyone else. He believed it was now possible for the jail to arrange this. The court agreed it was appropriate to permit defendant to speak with Houchin by telephone and not require him to visit her in jail every time he needed to speak with her. The court signed an order permitting defendant to telephone Houchin. It also issued an order directing the sheriff to permit defendant to meet face to face with Houchin and the defense investigator and that they "be provided the opportunity and facilities to play audio and video tapes" during the meetings.

28

The same day, the court signed an order directing the sheriff to conduct an "emotional state evaluation — medication status" on defendant. A fax sent to the court from Shirin Sharifa, Ph.D., on August 27, 2003, stated that defendant "had been receiving MHTX [apparently mental health treatment] from Twin Towers jail for the past 2 yrs. She was last evaluated by this clinician on 8-27-03."

A lengthy hearing concerning several matters was held on August 28, 2003. Based on conversations with jail personnel, the prosecutor expressed concern about the court's order permitting defendant to call her attorney from jail. He did not want to state his concerns in open court "because if she doesn't already know about this, it would be telegraphing to her what is possible." He stated that, based on his conversations, "I believe [defendant] knows how to manipulate the . . . phone system to call someone other than Mr. Houchin." Accordingly, the court held an in camera hearing in the presence of the prosecutor and Houchin but not defendant. The prosecutor explained his concern that defendant may have learned from other inmates how to use another inmate's booking number to call someone other than Houchin. Believing that "it's very important for a defendant, an inmate to be able to contact her attorney," the court let stand the previous order permitting defendant limited telephone access to her attorney subject to a jail deputy coming to court for further questioning.

Later during the August 28 hearing, in defendant's presence, Houchin told the court that defendant "said that she was told she's seen by someone every three weeks, and that's all they can do for her." The court reviewed the response from Dr. Sharifa dated the day before and expressed concern that it was inadequate. Houchin stated, "I have concerns after speaking with my client. I have seen certainly a change in her demeanor, and an onset of that has been within the last two weeks. This is something certainly additional or different than what they believe they've been treating her for for the last two years." Houchin asked to

29

have someone determine her emotional state, explaining, "I'm having a difficult time even when I go down to see her to keep her focused on things. Her emotional state is certainly not conducive to preparing for this trial." The court agreed to issue an appropriate order that Houchin prepared. Houchin said he would prepare an order for the next day.

Another hearing was conducted on August 29, 2003. It began in defendant's absence, but in Houchin's presence, as a continuation of the in camera hearing of the day before. The court spoke with a jail representative, then defendant appeared for the rest of the hearing. After a further hearing in defendant's presence, the court ultimately ordered that she be permitted to contact Houchin by telephone on Mondays, Wednesdays, and Fridays between 6:00 p.m. and 8:00 p.m. Houchin said, "That would be fine." The court signed a written order to that effect. The court also confirmed with the jail representative that defendant was entitled to face-to-face interviews in jail with Houchin and the investigator, with the ability to play tapes.

At defendant's request, the court next conducted an in camera hearing, with the prosecutor excluded, to address her medical concerns. Defendant complained that the jail had placed her in "211 isolation, which is the discipline unit." She believed there was no reason for her to be there. She expressed many complaints about her confinement and said she was sick, often vomited, could not eat or sleep, and suffered from claustrophobia due to the fact her jail cell had no window. She complained that her doctor in jail could only see her every three weeks rather than give her weekly therapy, which she believed she needed. The court noted that "there's evidence that you've engaged in misconduct that's been offered here, the evidence being that you've communicated with witnesses against you and you knew you shouldn't and you tried to persuade them to change their testimony, and with Ms. Hall that you tried to arrange to have the witnesses eliminated. So it's

30

not as though you're doing it, sitting there doing nothing.  The discipline sounds like it's appropriate.  The thing I want to find out too is about your medical condition."

After hearing further from defendant, the court asked what she thought was the solution.  Defendant said that she needed to be moved to another unit and, "in order to be able to help [her attorney] defend myself," she needed  more "mental psychiatric counseling."  The court said that "as far as discipline in the jail is concerned, it does seem appropriate . . . given the evidence that I've seen here, that Ms. Rodriguez not be treated as other inmates are, she's not in the standard population."  It expressed concern that the cell had no window.  But it said it could make no ruling regarding her housing by hearing only one side of the story.  It said, "the first step is for [defendant] to see the doctors and have a report to the court."  It again agreed to sign an order that Houchin prepared.  Houchin said he "appreciate[d] the court's  help.  I have noticed in the last several weeks' time spent with my client is, she is tearful, emotional, and she can only discuss these issues that she brought up to the court here, and my time is not being used to its best."

After again listening to defendant's concerns, the court said, "I won't do anything based on only one side of the story."  It suggested a new hearing where both sides could be represented.  It told defendant, "Ultimately I can issue orders that they have to follow based on your constitutional rights and the necessity to be able to prepare for this trial, but I . . . will not do anything just on hearing one side of the story.  I've heard your side.  If Mr. Houchin wants to pursue it and bring a hearing before the court, we'll do that at whatever time is appropriate on [September 15 ] or otherwise."

The same day, the court issued an order for a "psychiatric evaluation and report back to the court, Dept. 101."  On September 3, 2003, defendant, through

31

counsel, filed a formal "motion for evidentiary hearing re: defendant's constitutional rights and appropriateness of present housing assignment."

The court conducted the requested hearing on September 15, 2003, with county counsel representing the sheriff. The court stated that its "major concern is with [defendant's] ability to cooperate with counsel and prepare for trial. There are other concerns as well as to whether this is inappropriately restricting her at the county jail." Psychologist Michael Maloney, the "program director for women's mental health for L.A. County jails," testified. He said that "defendant is seen by Dr. Diana Delcarlo, who is a psychiatrist. She sees her every three weeks, talks to her and has prescribed Wellbutrin and buspirone, both mild antidepression, anti-anxiety drugs." He said the number of visits defendant received was "more than a typical inmate her capacity would receive." She was not defined "as in need of mental health counseling." The determination that an inmate needed mental health counseling could be "made by any number of people," but no one had done so regarding defendant.

Maloney said that Dr. Kevin Christy, a psychologist, had seen defendant in July. He "was of the mind that it would be good to talk to her once a week, and I said we don't have the staff to do that." Regarding whether Dr. Christy believed defendant "should" be seen once a week, Maloney said, "The only word I'd question is 'should.' I mean it's not like a psychological or psychiatric emergency. I mean he felt it would be helpful, nice for her to be able to talk to someone, and I would fully agree with that, but her condition doesn't warrant it." He said that every inmate in her unit "would like to talk to somebody on a regular basis. We get requests all the time."

Deputy Nicholas Zabokrtsky testified that defendant was housed in module 211, an "administration segregation" unit. The cells in that module had no windows except on the door, and the door windows were generally closed due to a

court order issued for security reasons. Module 231, another administrative segregation unit, was less restrictive and had a window to the outside. At the time of the hearing, defendant received "day room privileges" for one hour a day, meaning she could go to a room with a window onto the housing unit and shower and "just have time outside of her cell."

After the hearing, the court declined to order defendant moved to module 231, but it expressed concern about her being housed in a cell with no window. Ultimately, after considerable further discussion among the parties and defendant personally regarding defendant's concerns and jail security considerations, the court ordered that the window on defendant's jail cell be opened for two hours a day during her waking hours, that she receive increased clinician visits, and that she be permitted to shower every other day.

On September 26, 2003, the court received from defendant a four-page handwritten document labeled "special in parte motion for in camera hearing by defendant." Among other things, defendant said there was a "complete breakdown of trust and conflicts of interest" with Houchin. After reviewing the document, the court treated it as a request for a "*Marsden* hearing" (*People v. Marsden* (1970) 2 Cal.3d 118) and for a postponement of trial. It conducted the hearing the same day in the prosecutor's absence.

Defendant spoke at length at the in camera hearing. Partly she reiterated some of her previous complaints about her confinement. But she also complained about her attorney, Houchin. She said, "I believe he's a good attorney," but she expressed concerns about the investigation. Her main concern was about presenting a mental defense. She especially wanted someone to present a mental defense regarding the solicitation charge. Specifically, she wanted the defense to use an expert named Dr. Castellano rather than Dr. Vicary (the expert who ultimately testified on her behalf at the penalty phase). She wanted various people

33

who worked in the jail, including doctors, and some inmates, to be contacted as possible witnesses regarding the solicitation charge. She also expressed concerns about some of her jailers, including Deputy Rachel Jimenez, who was listed as a possible witness in the case.

After hearing from defendant, the court asked Houchin to respond. He noted that "diminished capacity is no longer a defense." He stated that "with regards to her mental state, I've had the opportunity to have and review for some time and with others a report, a very lengthy report prepared by a panel psychologist Dr. Richard Romanoff." The court noted, and Houchin agreed, that Dr. Romanoff is "one of the best." Houchin said that "because of discussions that I've had with my client with respect to Dr. Romanoff and with Dr. Romanoff himself and also with other counsel that have preceded me on this case, without getting into the specifics, that's why I need to make a change in the mental health expert insofar as the penalty phase, and that has been done." He said he believed the new defense expert, Dr. Vicary, was "very competent" and would be prepared for what they might need at a penalty phase. He knew that defendant wanted to use Dr. Castellano. But he explained that after Dr. Castellano had "had discussions with other attorneys," she declined to be an expert on defendant's behalf. He said, "I'm sure [Dr. Castellano] would have been very qualified. I know that Dr. Vicary is very well qualified."

Houchin said, "With respect to . . . the defense that she wishes that there be more investigation of the solicitation, there are only certain things that others can do for us on that mental state. I'm sure that Dr. Vicary, and I've talked to him about also addressing that issue, that was not an issue when the initial report was prepared by Dr. Romanoff. This occurred . . . after he did his workup. Certainly Dr. Vicary will rely in part on the report and the work and the tests that Dr. Romanoff did, and I have asked him also if he could take a look at the issues that

my client wishes very much to discuss, what, if any effect her treatment by the deputies in 211 had on her committing what's been alleged as a solicitation of murder."

When the court asked him to comment on defendant's desire to have other witnesses regarding the solicitation count, Houchin replied, "These are people who my understanding, talking with my client, also she has provided a list of these people for the investigator that's been appointed on this case, go also to the issue of things that may have been said by Jimenez to others there, things that Jimenez has done not only to my client but to other people who are there, and pretty much the way I understand it a character impeachment perhaps of Deputy Jimenez on the issue of what may have led to my client doing what is alleged in the solicitation for murder count."

The court asked whether Houchin believed there was a problem "with having [Deputy Jimenez] as a potential witness and also being in whatever control there is of Ms. Rodriguez." Houchin responded that Deputy Jimenez did not have much personal contact with defendant. He added, "And to be honest about it, judge, when I have people that are in the position to come in in a guilt phase or certainly a penalty phase with regards to my client's activity, my concern was, should my client be transferred someplace else, the potential was I could double up the number of deputies who would be coming in here with not so kind things to say of my client. I was thinking more in terms of damage control, I'll be very honest with the court. With respect to where my client was, talking with her, keeping her settled, being able to keep the potential evidence against us that may come in in the penalty phase at a minimum."[4]

---

**4**    Deputy Jimenez had testified in a hearing held before this in camera hearing, but she did not testify at trial.

35

The court asked whether Houchin was ready to try the case. He responded that he was. He explained that "my approach to this case and my theory of representing my client has differed with her opinions and her wishes and her desires, and these are just hard decisions that I have to make, and I am going to make them."

After hearing from both defendant and Houchin, the court denied defendant's request for a new attorney and a postponement of trial in a detailed oral ruling.

The jury selection portion of trial began on September 29, 2003, and the presentation of evidence began on October 15, 2003. On October 23, 2003, the court issued a medical order to the sheriff stating, "Medications prescribed have not been dispensed due to [defendant] being in court. Please dispense." The next day, the court issued another medical order stating that "defendant is ill," and ordering treatment for "swollen throat, cough, and high fever."

The jury returned its penalty verdict on November 12, 2003. On November 14, 2003, the sheriff provided a written report to the court. The report stated, "In response to your court orders dated October 23rd and October 24, 2003, Inmate Angelina Rodriguez was examined and treated on November 12, 2003 at Twin Towers Correctional Facility, by Manuel Natividad, M.D." Under "remarks," the report stated: (1) "Patient has a current diagnosis of Cold Symptoms (resolved)"; (2) "Patient's medications are up-to-date"; (3) "Patient's prognosis is good"; (4) "Patient's care and treatment are continuing"; and (5) "Patient is fit to continue trial proceedings."

Defendant handwrote a long letter to the court dated December 3, 2003, expressing various concerns about Houchin, mail delivery, and other matters, and making various requests, including immediate delivery of mail addressed to her, appointment of an appellate attorney, daily delivery to her of the Los Angeles

36

Times, and restoration of telephone privileges. The court conducted a hearing on December 12, 2003.

The court believed it was not appropriate to restrict defendant's mail delivery. Houchin said he was "unaware of any problems with the mail," but defendant said she had not seen any mail in over two months. The court agreed she had a right to receive her mail. It directed the bailiff to look into the matter to determine whether it might have to issue an order. It also agreed that, "given the restrictions," defendant should receive the Los Angeles Times, and it so ordered. It declined to restore defendant's telephone privileges, noting that "based on the evidence that I heard during the trial, I'd be very concerned still for witnesses." It believed "their lives are still at risk." Regarding defendant's request for an appellate attorney, the court noted that "we obviously will have time to work on that."

On an unrelated point, the prosecutor said that he wished to place certain information on the record at a later court date for appellate purposes. Specifically, he wanted to present evidence that the investigators had arranged the tape-recorded meeting between Deputy Mejia, posing as the fictitious middleman, and defendant because of concerns that defendant might have been soliciting other inmates to murder Gorham. He wanted to show that the action was "not intended to create consciousness of guilt evidence, it was intended to make sure we did everything that we could to protect Ms. Gorham and guarantee that if there was anybody on the outside who intended to follow through on this request, we did our very best to investigate this case and prevent it from happening." The court gave permission for the prosecutor to present the evidence. The prosecutor did so at a later date.

At the same hearing, defendant stated that she wanted to read a "long statement" to the court. The court said, and she agreed, that it "would be

37

appropriate" to read the statement when the court considered the automatic motion to modify the judgment. Defendant also said she was "in leg chains and the black box," and complained about extra security in the jail. She said, "I'm not a threat whatsoever in jail." The court stated that defendant should not be restrained in court because "I agree she's not a physical threat at least in court." It scheduled another hearing to consider the necessity of restraints in jail.

The new hearing was held on December 18, 2003. The court stated that the restraint it had seen in court seemed "excessive without some explanation." Accordingly, two witnesses, Psychologist Kevin Christy, and Deputy Zabokrtsky, testified about jail security concerns. Christy said that around the time of the jury's death verdict, he had been called to examine defendant at her request. She had just returned from court and was upset about Deputies Jimenez and Zabokrtsky. "She requested that they . . . not be around her because she didn't know how she would respond to them." She said "she was afraid she might do something to them." Because of this statement, he was concerned about their safety.

Deputy Zabokrtsky testified that when an inmate receives a death verdict "it is common practice for us to increase our security level in our handling of that inmate based on at that point that individual no longer has anything to lose." Regarding defendant specifically, he stated several security concerns, including the death verdict, her solicitation of murder while in custody, and the concern Dr. Christy had expressed. All of these factors caused the jailers to increase her restraints in jail. The court permitted defendant personally to argue that the additional restraints were unwarranted. She reiterated, "I'm not a threat to anybody."

The court found the additional restraints in jail justified "primarily because of the death verdict and because of the solicitation for murder previously." It

38

added, "I do understand that blowing off steam on the day the death verdict is something that could have been very temporary and not well intended, but the other two reasons are very strong reasons for additional security." It "agree[d] that physically alone at least you [defendant] are not a threat in the courtroom." Accordingly, it ordered defendant not be restrained at the next court appearance. The court also reiterated that defendant was to receive a copy of the Los Angeles Times in her cell (apparently she had not been receiving it) and all of her mail.

The next court appearance was held on January 12, 2004, at which the court denied defendant's automatic motion to modify the death verdict and imposed the sentence of death. Before ruling on the motion to modify the judgment, the court permitted defendant to make a long statement. Among many other things, she reiterated many of her previous complaints about her incarceration.

### 2. *Asserted Unlawful and Inhumane Conditions of Confinement*

Defendant contends she "was subjected to unlawful and inhumane conditions of confinement" in violation of various constitutional rights.

"Some courts have recognized, in the context of civil rights actions brought by pretrial detainees, that certain conditions of confinement may so impair the defendant's ability to communicate with counsel or otherwise participate in the defense that a due process violation or an infringement of the right to effective assistance of counsel results. [Citations.] On the other hand, conditions of confinement that have not actually affected the defendant adversely are not grounds for reversal of a conviction . . . ." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1002.) Here, nothing in the record suggests that improper conditions of confinement affected defendant's ability to communicate with counsel or otherwise participate in the defense.

39

Defendant certainly complained a lot. But complaints alone do not establish unconstitutional conditions. Contrary to her protestations at various hearings, defendant was an obvious and serious security risk. Evidence before the trial court (and later presented at trial) showed that while in jail, she abused her telephone privileges by attempting to dissuade a witness, a criminal offense. (§ 136.1, subd. (a)(2).) Defendant's criminal behavior then escalated to soliciting that same witness's murder. Under the circumstances, jail personnel, and ultimately the trial court, properly were concerned about the possibility of further criminal behavior. The trial court listened to defendant's many complaints, held hearings, and took appropriate remedial steps to ensure that she was able to defend herself. "The record in the present case does not indicate that the conditions of defendant's confinement so interfered with [her] ability to communicate with counsel or assist in the defense as to constitute a violation of defendant's rights to due process or the effective assistance of counsel." (*People v. Jenkins*, *supra*, 22 Cal.4th at pp. 1002-1003.) As in *Jenkins*, the trial "court was solicitous regarding defendant's complaints," it held "hearings to attempt to resolve problems," and it made appropriate remedial orders. (*Id*. at p. 1003.)

We also "note that a trial court properly defers to a great extent to the judgment of jail authorities regarding the conditions of a pretrial detainee's confinement. [Citation.] The court generally defers to such authorities regarding restraints on the defendant's liberty if these constraints are reasonably related to a legitimate government purpose — such as . . . to meet institutional security needs and the need for internal order and discipline [citation] — unless there is substantial evidence in the record to indicate that such conditions impose restraints that are excessive relative to the legitimate governmental purpose. [Citation.] The record suggests strongly that the conditions imposed upon defendant related to legitimate governmental purposes, and in any event [her] claim has little to do

40

with the validity of the judgment entered against [her] if [her] right to a fair trial otherwise was observed." (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 1006, fn. 22.) Here, the court did not always defer to jail authorities. It took active steps to protect defendant's ability to defend herself. We see no basis to reverse the judgment due to defendant's conditions of confinement.

### 3. *Asserted Limitations on and Interference with Defendant's Communications with Her Attorney*

Defendant also contends "the trial court's denial of telephone access and visits from her defense counsel, and permitting jail interference with correspondence and legal materials deprived" her of various constitutional rights.

The court never denied defendant visits from her counsel. Indeed, it repeatedly ordered jail authorities to permit her face-to-face visits with her attorney and, later, investigator, including the opportunity and facilities to play audio and videotapes. The court also never permitted jail interference with her correspondence and legal materials. Whenever defendant complained of such matters, the court conducted hearings and took steps that, as far as the record shows, resolved any problems.

Jail authorities and the court did limit defendant's telephone privileges, but properly so given her criminal behavior in jail that abused those privileges. The court presided over several hearings held to determine how to give her as much access to her attorney as possible consistent with institutional security needs. During some of the time before trial, her attorney had to visit her in jail rather than receive telephone calls from her, which was no doubt inconvenient. Criminal behavior often has inconvenient consequences. But the court was always solicitous of defendant's right to reasonable access to her attorney and took reasonable steps to ensure it. Indeed, a month before jury selection began, the court arranged a system whereby defendant could call her attorney three days a

41

week during certain hours. Defense counsel said that "would be fine." This record presents no reason for this court to disagree with counsel's assessment. Defendant received a full opportunity to defend herself.

Defendant also argues the trial court denied her "the right to consult with an appellate attorney," when it declined to appoint an appellate attorney to represent her shortly after the penalty verdict. But the trial court had no obligation to appoint an appellate attorney to represent her, and certainly not before she was even sentenced. This court, not the trial court, appoints the appellate attorneys in capital cases. (Cal. Supreme Ct., Internal Operating Practices & Proc., XV., A., 2.) We have done so in this case, and defendant is represented on appeal.

### 4. Asserted Failure to Discharge Defendant's Retained Counsel

Defendant contends the "trial court committed reversible error when it failed to discharge [her] retained attorney at her request."

To summarize the relevant facts, in December 2001, defendant told the court she was "seeking replacement counsel." She had not then obtained replacement counsel and wanted to have her telephone restrictions lifted so she could try to find a new attorney. After a hearing, the court refused to lift the restrictions. In January 2002, defendant wrote a letter saying she had "removed" her retained counsel, Ward, as her attorney. But she had not yet obtained a new attorney. At a hearing on January 16, 2002, the court acknowledged that defendant could change attorneys if she wished and discussed her options with her. But it also took steps to ensure that Ward would continue to represent her unless and until she obtained a new attorney. Defendant voiced no objection to Ward's continuing to represent her for the time being. In August 2002, Ward asked to be removed as defendant's attorney, and defendant asked to receive a new

42

court-appointed attorney. At that time, over a year before the trial began, the court appointed Houchin to represent her and removed Ward as her counsel of record.

In general, a criminal defendant has the right to discharge her retained attorney. (See *People v. Ortiz* (1990) 51 Cal.3d 975, 983.) But we see no error in these circumstances. The court did discharge Ward as defendant's attorney and, at her request, appointed a new attorney to represent her. It did not do so in January 2002, when defendant first said she had "removed" him. At that point, defendant had not yet decided how to replace him. Discharging Ward then would have left her unrepresented. But she never indicated she wanted to be left unrepresented. A trial court is not obligated to discharge retained counsel the instant a defendant states the intent to remove that attorney and even before the defendant decides on a replacement.

Defendant can also show no prejudice. More than a year before trial began, at defendant's request, the court appointed Houchin to represent her. He continued to represent her from that point on until, during, and after trial. The failure to discharge Ward in January 2002, rather than in August 2002, when defendant decided she wanted appointed counsel, merely meant that she did not go unrepresented in the interim, which could not have prejudiced her.

### 5. *Denial of Defendant's Request for a New Appointed Attorney*

Before trial, defendant asked the court for a new attorney, claiming Houchin was providing ineffective assistance. The court presided over a hearing in the prosecutor's absence and then denied the request. Defendant contends the court erred.

When a defendant seeks to obtain a new court-appointed counsel on the basis of inadequate representation, the court must permit her to explain the basis of her contention and to relate specific instances of inadequate performance. The

court must appoint a new attorney if the record clearly shows the current attorney is not providing adequate representation or that defendant and counsel have such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Jackson* (2009) 45 Cal.4th 662, 682; see *People v. Marsden*, *supra*, 2 Cal.3d 118.) If the court holds an adequate hearing, its ruling is reviewed for abuse of discretion. (*People v. Panah* (2005) 35 Cal.4th 395, 431.)

Here, the court provided defendant a hearing and the full opportunity to express her concerns. It then heard from counsel, which was appropriate. (*People v. Panah*, *supra*, 35 Cal.4th at p. 432.) Counsel responded point by point to defendant's concerns. He was aware, for example, that defendant had wanted Dr. Castellano to act as her mental health expert, but he explained that she had declined to do so.[5] He assured the court he was prepared for trial. To the extent there may have been some disagreements between Houchin and defendant regarding trial tactics, that disagreement did not compel a change of attorneys. "A defendant does not have the right to present a defense of his own choosing, but

---

[5] Defendant argues that Houchin's "decision to use Vicary was disastrous. Vicary was ill prepared. He did not verify the information provided him almost entirely by [defendant] and was impeached on that very shortcoming. Having been provided by Houchin with a prior doctor's report, Vicary offered some of the most damaging testimony against [defendant] — that she intentionally enlisted the assistance of her 9 year old daughter to kill her husband. Vicary did not testify to any aspect of [defendant's] mental state which might negate the specific intent element of the crimes with which she was charged." The record does not support these assertions. Dr. Vicary seemed fully prepared. No reason appears to assume he did anything but the best he could have done under the circumstances. For example, in light of the extraordinarily calculated nature of defendant's killing of her husband (on her third attempt, in order to collect on a life insurance policy), the record presents no basis to assume Dr. Vicary could have provided any credible testimony to negate the mental state necessary for first degree murder. Additionally, presenting expert mental health testimony inherently risks inviting damaging cross-examination.

merely the right to an adequate and competent defense.  [Citation.]  Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.'  'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' "  (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.)  We see no abuse of discretion in the court's denial of defendant's motion for a new attorney.

### *6.  Defendant's Competence to Stand Trial*

Defendant contends she was incompetent to stand trial, and that the trial court erroneously failed to conduct a meaningful hearing on her competence.

"Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law require a trial judge to suspend proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial."  (*People v. Blair* (2005) 36 Cal.4th 686, 711.)  "A defendant can create reasonable doubt through substantial evidence of mental incompetence, or the trial court can raise the issue on its own."  (*People v. Ary* (2011) 51 Cal.4th 510, 517.)  A defendant is incompetent to stand trial if she is unable to consult with her attorney with a reasonable degree of rational understanding or lacks a rational and factual understanding of the proceedings against her.  (*Ibid.*; see § 1367, subd. (a).)  "[A]bsent a showing of 'incompetence' that is 'substantial' as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial."  (*People v. Mai* (2013) 57 Cal.4th 986, 1033.)

45

Here, not only did the court have the opportunity to observe defendant *during* trial, it had the opportunity to observe her at many pretrial hearings at which she often spoke at great length. It did not err in failing to inquire into defendant's mental state more than it did. The record contains no substantial evidence that she was incompetent to stand trial, i.e., that she was unable to consult with her attorney with a reasonable degree of understanding or lacked a rational and factual understanding of the proceedings. Defendant and, on one occasion, her attorney expressed concern that some of her conditions of confinement were affecting her mental state and her ability to help prepare a defense. She was receiving mental health treatment in jail, but she said she needed more treatment. The court inquired into the medical concerns and ordered a psychiatric evaluation. It also ordered that defendant receive more frequent clinical visits. But the purpose of these orders was to determine whether defendant's concerns were valid and whether yet more mental health treatment was necessary. No one suggested she was actually incompetent to stand trial.

Defendant's many lengthy statements before the court, including during the *Marsden* hearing held a few days before trial, showed she was articulate, understood the charges against her, and was able to assist counsel. (See *People v. Lewis* (2008) 43 Cal.4th 415, 525-526.) No reason appeared for the court to suspend proceedings and conduct a competency hearing.

### 7. *Defendant's Absence from Proceedings*

Defendant contends she was erroneously absent from court proceedings on three occasions: (1) a portion of the hearing on August 28, 2003, regarding defendant's telephone restrictions; (2) the beginning of the hearing on August 29, 2003, which was essentially a continuation of the in camera hearing on the previous day; and (3) the beginning of the hearing on September 29, 2003, the first

46

day of jury selection.  Before defendant appeared on September 29, the court ordered Gwendolyn Hall, who had been subpoenaed for that day, to appear at a later date.  Defendant was then brought into court and she was present thereafter.  Her attorney was present on all three occasions.

"Broadly stated, a criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law . . . ."  (*People v. Cole* (2004) 33 Cal.4th 1158, 1230.)  However, "[a] defendant is not entitled to be personally present during proceedings that bear no reasonable, substantial relation to his opportunity to defend the charges against him, and the burden is on the defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial."  (*People v. Benavide*s (2005) 35 Cal.4th 69, 89.)

The hearings held in defendant's absence bore no substantial relation to her opportunity to defend against the charges.  The portions of the hearings on August 28 and 29, 2003, were conducted in defendant's absence so the prosecutor could explain to the court how inmates were able to use jail telephones to call someone they were not supposed to call.  The prosecutor and court were understandably reluctant to educate defendant on how she could manipulate the system, in case she did not already know.  In any event, defendant was represented by counsel at all times, and most of the hearings regarding restrictions on her telephone access were conducted in her presence.  She was present, for example, at the latter portion of the August 29, 2003, hearing when the court ordered that she be permitted to contact her attorney three days a week during specified hours.  Her absence during parts of those hearings did not affect her opportunity to defend against the charges.  Her brief absence at the beginning of the September 29, 2002, hearing, when the court merely ordered a witness to appear at a later date,

47

obviously also bore no relation to defendant's opportunity to defend against the charges.

### 8. Asserted Judicial Bias

Defendant contends Judge Pounders was biased against her. She never objected on this basis, or moved to disqualify him for bias, at any time during the lengthy pretrial proceedings over which he presided or during or after trial. Accordingly, this claim is forfeited. Defendant may not go to trial before a judge and gamble on a favorable result, and then assert for the first time on appeal that the judge was biased. (*People v. Farley* (2009) 46 Cal.4th 1053, 1110; *People v. Chatman* (2006) 38 Cal.4th 344, 362-363; see *People v. Rogers* (1978) 21 Cal.3d 542, 548 ["The contrary rule would . . . 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.' "].)

Moreover, the contention lacks merit. Judge Pounders was very responsive to defendant's legitimate concerns and needs. He always patiently permitted her to speak when she wished. He took active steps to ensure she had adequate access to her attorney and to protect her other rights. After trial, he went so far as to order the Los Angeles Times to be delivered to her cell. Contrary to defendant's argument, the fact the judge permitted the prosecution to place certain information on the record after the trial did not show bias. He permitted both sides to place matters on the record. The record contains no hint of judicial bias.

### B. Guilt Trial Issues

### 1. Excusal for Cause of Two Prospective Jurors

Defendant contends the court erred in excusing for cause two prospective jurors. The court may excuse prospective jurors for cause if their views on the death penalty would prevent or substantially impair the performance of their duties

48

as jurors.  (*People v. Duenas* (2012) 55 Cal.4th 1, 10.)  The court may excuse prospective jurors for other reasons if their state of mind will prevent them from acting impartially and without prejudice to any party.  (*People v. Carasi* (2008) 44 Cal.4th 1263, 1290.)  The standard of review in both situations is the same.  "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence."  (*People v. Duenas*, *supra*, at p. 10.)

The first of these prospective jurors stated on her questionnaire that her general feelings about the death penalty were "for and against" and her philosophical opinion was "neutral."  She believed life in prison without the possibility of parole was a worse punishment than death.  She was an employee of the Los Angeles County District Attorney's office (the office prosecuting the case), but she said she could vote not guilty.  During questioning by the court regarding the death penalty, she said she could adjust her thinking regarding which punishment was worse and vote for life if appropriate.  She also indicated that in death penalty prosecutions she had "come across in my dealings with the office," only once had she agreed with it.  She told defense counsel her mind would be open to either punishment, and that she believed the death penalty was not used enough.

When the prosecutor asked her whether she could personally vote for death, she said, "I don't know."  She reiterated that she had seen death penalty cases in her experience as an employee of the district attorney's office, and only once had she agreed with the decision to seek the death penalty — in a case in which the "defendant was very violent and he had committed several murders and he had finally been caught."  When asked again whether she could personally vote for death, she responded, "I'm not sure."  She said that was the best answer she could

49

give.  She added that she would be more comfortable not sitting on a death penalty case, explaining, "You holding somebody's life in your hands, and I mean people do wrong, but I'm not really really really for the death penalty.  I understand it and I think there are some circumstances it should be death, but I don't know if I personally could say, yeah, this person deserves to die."

The court excused this prospective juror for cause.  It noted that her answers to its questions had made her appear acceptable, but it believed that "her statement finally that she was not sure that she could impose the death sentence I think does indicate that it is . . . not a realistic, practical possibility that she would do that, particularly given the circumstances here.  Perhaps on a defendant who has killed 25 people she might be able to do that, so I will allow the challenge for cause" as to that juror.

The record supports the court's excusal of this juror.  She assured defense counsel that she could vote for life in an appropriate case, but she could not give a comparable assurance that she could vote for death in an appropriate case.  In this situation, we must defer to the trial court's judgment regarding this prospective juror's state of mind.

The second of these prospective jurors answered "yes" on the jury questionnaire to the question whether he had any religious or moral feelings that would make it difficult or impossible to sit in judgment of another person.  He explained, "Most engrained in my mind is the dictum:  'Judgment is mine!' Vengeance is as hazy as judgment to me."  He said law enforcement had once been "non-chalant" in responding to a crime involving a friend or relative.   He also noted an unpleasant experience he had had with a peace officer, although he also said that a peace officer had been "very helpful and courteous."  He said he was moderately in favor of the death penalty.

During voir dire, when asked whether his concern about law enforcement would cause a testifying officer to "have to prove something extra to be believed by you," he responded, "My feelings ambivalent, but I would take it one at a time." He said he would not "hold this against the officer testifying." Later he said, "And I would be very very . . . questioning on the officer's veracity . . . ." But he added, "I don't make a general statement." He told defense counsel he would not automatically disregard a law enforcement officer's testimony. But when the prosecutor asked whether he would have more questions about a police officer's credibility than other witnesses, he responded, "I think I would have, yeah." Specifically, he would treat a deputy sheriff who testified "differently in terms of evaluating the credibility than [he] would a regular witness who wasn't a law enforcement officer."

When asked about the death penalty he said, "My attitude towards capital punishment is, if it is . . . a punishment, it is my feeling doesn't seem to be a deterrent to — it doesn't seem to achieve the purpose really. My feelings as far as it's — it's still a tooth for a tooth kind of thing rather than to punish the accused. And I tend more to not favor capital punishment." Later he said he was "moderately" in favor of the death penalty. He added that he could impose the death penalty. When asked about his "vengeance is mine" response on the questionnaire, he said, "It's more on the penalty portion of it, on the . . . capital punishment." He said he could be fair to the prosecutor's side, but he also said that, although he could "be in judgment" regarding guilt, "the capital punishment is one that makes me uncomfortable." When asked whether the lack of comfort would affect his ability to be fair to the prosecutor, he responded, "I don't think so because . . . mine is emotional side. If I divorce my emotions from or my . . . kind of belief that capital punishment is not a deterrent, if it is only on that phase, it's not — I . . . would not be affected by your . . . side. I would still be . . . fair to

51

your arguments." He would "definitely make sure that my emotion will not enter into it."

The prosecutor challenged this juror for cause both because he would not judge police officers by the same standards as other witnesses and because of concerns about his ability to decide penalty. He explained, "I believe that notwithstanding his final answer, he's given other answers which indicate that he's incapable, I think, of deciding penalty fairly." Defense counsel objected, arguing the juror could be fair.

The court granted the challenge. It was concerned about the juror's explanation that the "vengeance is mine" answer on the questionnaire "didn't apply to the guilt phase, it applied to the penalty phase." It noted that the answer occurred early in the questionnaire, long before there was any mention of the death penalty. "So when he answered, he did not know that the penalty was a possibility of death, so I don't accept his answer as being that's what he's saying, that it deals only with the penalty. He's basically saying that's going to affect — the charges here are going to affect him, even deciding the guilt phase of the case. Anyway, on both issues, I will accept the challenge for cause."

The record supports the court's determination that this juror's state of mind would prevent him from being entirely impartial. The juror's explanation regarding his "vengeance is mine" answer was quite confused, and he essentially admitted he would judge law enforcement witnesses by a different standard than other witnesses. Accordingly, as we must, we defer to the court's ruling as to this prospective juror. We see no error.

### 2. Evidentiary Rulings

#### a. Admission of Demeanor Evidence

Defendant contends the court erred on several occasions in permitting witnesses to testify regarding her demeanor. The court generally overruled her objections that the testimony was speculative.

Officer Sharpe, who first responded to the call at defendant's home the morning Frank died, testified about her demeanor and contrasted it with the demeanor of others who had lost a loved one that he had had contact with in the past. Frank's sister, Rebecca Perkins, testified about defendant's lack of emotion when she spoke with defendant the day Frank died. When Perkins later said that defendant "wasn't upset for losing a husband," the court sustained defendant's objection on the ground it was speculative. Defendant's other sister, Shirley Coers, testified that when she spoke with defendant shortly after Frank's death, "she always seemed very calm"; she seemed "not upset, not crying, not sad." Mickey Marracino, the life insurance agent whom defendant contacted shortly after Frank's death, testified about her lack of emotion and said, "she didn't stop to compose herself the way other people have done when I've talked to them when they've lost a loved one." Detective Wilsey, the original investigator into this case, testified about defendant's lack of emotion. He explained, "Her first questions were relating to the coroner's department, the disposition of the body. She had mentioned that she wanted to have the body cremated, and the questions were centered around that, not . . . cause of death, which is normally what we hear or . . . what's happening with the case, that kind of a thing."

Defendant contends this demeanor testimony was "irrelevant, without foundation, and based on speculation." [6]  However, she objected at trial only on grounds that the testimony was speculative.  Accordingly, only that objection is cognizable on appeal.  (*People v. Partida* (2005) 37 Cal.4th 428, 433-434.)  An objection was particularly necessary regarding defendant's lack-of-foundation claim.  An objection on that basis would have allowed the party offering the evidence to lay additional foundation as needed.  (*People v. Partida*, *supra*, at p. 434.)  In any event, defendant does not explain what foundation was lacking and we perceive no missing foundation.  The witnesses spoke from personal knowledge.

To the extent, if any, that defendant's relevance contention differs from the contention that the testimony was speculative, that contention is not cognizable.  Moreover, the testimony was relevant.  It had a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  It was relevant on the question of whether defendant was a grieving widow or had just killed her husband to collect life insurance proceeds, a question obviously of consequence in deciding whether defendant was guilty of her husband's murder.

Defendant's argument that the testimony was speculative is cognizable.  To some extent that objection is inherently based on relevance.  "[T]he prohibition against an examiner's question that calls for an answer based on speculation and

---

[6]      Defendant also contends the court erred in permitting Sergeant Holmes to provide demeanor testimony at a pretrial hearing.  This testimony was not presented at trial.  Defendant asserts, without elaboration, that some of the "demeanor testimony contributed to erroneous pretrial rulings."  But defendant does not identify those pretrial rulings or explain how they were erroneous, how the demeanor testimony contributed to the asserted error, or how the rulings affected the trial.  Accordingly, we do not consider this point.

conjecture is also founded on the concept of relevancy. Such testimony is irrelevant, because it does not have a tendency in reason to prove or disprove the disputed issue on which the testimony is proffered." (1 Jefferson's Cal. Evidence Benchbook (Cont. Ed. Bar 4th ed. 2013) Competency, Examination, and Credibility of Witnesses, § 28.56, p. 534.) Accordingly, to the extent defendant's relevancy argument is included in her argument concerning speculation, that argument is cognizable. But we see no error. No blanket rule prohibiting demeanor testimony exists, and the trial court here reasonably found the actual testimony not speculative.

"[A]n examiner's question asking a lay witness to testify to facts that the witness has not personally observed, or to state an opinion not based on his or her own observations, calls for speculation and conjecture by the witness and is prohibited by" Evidence Code sections 702 and 800. (1 Jefferson's Cal. Evidence Benchbook, *supra*, § 28.56, p. 534.) Here, the testimony the court permitted was based on facts the witnesses had personally observed. The court did not abuse its discretion in finding the testimony not speculative. (*People v. Taylor* (1990) 52 Cal.3d 719, 739.)

Defendant cites *People v. Sergill* (1982) 138 Cal.App.3d 34, where the appellate court found the trial court had erred in permitting police officers to testify that, in their opinion, a certain witness was credible. The demeanor testimony of this case, based on the witnesses' own perceptions, bears no resemblance to the testimony found inadmissible in *Sergill*.

The parties debate at length whether the testimony was admissible as either lay or expert opinion. However, defendant did not object that the testimony was impermissible opinion, so any argument in this regard is not cognizable. Moreover, it does not appear the court admitted the evidence as opinion testimony. The testimony was based on the witnesses' own perceptions. Indeed, the court

55

*sustained* defendant's objection to Perkins's statement that defendant "wasn't upset for losing a husband," which does appear to have been an opinion. Contrary to defendant's assertion that the court's rulings were inconsistent, the court consistently permitted the witnesses to testify about what they had observed, but not to express an opinion as to the meaning of those observations. Doing so came within its discretion.

Defendant also challenges the admissibility of Sergeant Holmes's testimony that "I knew that she was calling every day and every single conversation was regarding financial, getting money to make it, and she wanted the coroner's office to come back as soon as possible with a cause of death so that she could be financially better off." Defendant did not object to this testimony, so the contention is not cognizable. Moreover, this was not demeanor testimony at all but was merely Sergeant Holmes's summary of his many telephone conversations with defendant during the investigation. No basis appears for defendant to have objected to this testimony.

### b. Asserted Violation of Confrontation Rights

Defendant contends the court violated her right to confront witnesses under the Sixth Amendment to the United States Constitution.

Defendant first challenges the admission of statements Gwendolyn Hall made to law enforcement agents regarding defendant's efforts to solicit Gorham's murder. The prosecution called Hall as a witness, and she testified in front of the jury. Although she provided some testimony, she also claimed not to have any memory regarding the events she had told law enforcement agents about. Defendant then cross-examined her. The trial court found Hall's "statements that she does not recall are not truthful" and, over defendant's objection, admitted evidence of her prior statements.

56

Admitting the prior statements did not violate defendant's right to confront Hall. Hall testified at trial and was subject to cross-examination. The United States Supreme Court has made clear that admitting prior statements of a witness who testifies at trial and is subject to cross-examination does not violate a defendant's confrontation rights. (*California v. Green* (1970) 399 U.S. 149; see *People v. Green* (1971) 3 Cal.3d 981 [same case on remand].)

In support of her argument, defendant cites a series of high court decisions beginning with *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). Those cases changed constitutional confrontation law in a significant respect. *Crawford* held that the prosecution may not rely on "testimonial" out-of-court statements unless the witness testifies at trial or is unavailable to testify and the defendant had a prior opportunity for cross-examination. (See, e.g., *People v. Lopez* (2012) 55 Cal.4th 569, 576-580.) But those cases made no change regarding use of prior statements of a witness who actually testifies. *Crawford* itself "reiterate[d] that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (*Crawford*, *supra*, at pp. 59-60, fn. 9 [citing *California v. Green*, *supra*, 399 U.S. 149 ]; see *People v. Cowan* (2010) 50 Cal.4th 401, 463 ["The Sixth Amendment's confrontation clause does not prohibit admitting into evidence 'testimonial' hearsay statements against a defendant if the declarant appears for cross-examination at trial."].)

As a practical matter, Hall's claim of total lack of recall limited defendant's ability to cross-examine her about her prior statements. But this circumstance does not implicate the confrontation clause. (*United States v. Owens* (1988) 484 U.S. 554, 555-560; *People v. Dement* (2011) 53 Cal.4th 1, 23-24.) "The witness . . . was not absent from the trial. She testified at length at trial and was subjected to lengthy cross-examination. The jury had the opportunity to observe

57

her demeanor, and the defense cross-examined her about bias. Even though she professed total inability to recall the crime or her statements to police, and this narrowed the practical scope of cross-examination, her presence at trial as a testifying witness gave the jury the opportunity to assess her demeanor and whether any credibility should be given to her testimony or her prior statements. This was all the constitutional right to confrontation required." (*People v. Perez* (2000) 82 Cal.App.4th 760, 766.) The same is true here.

It is not clear whether defendant also contends that admitting Hall's prior statements violated state law. But doing so did not violate state law. "A witness's prior statement that is inconsistent with his or her testimony is admissible so long as the witness is given the opportunity to explain or deny the statement. (Evid. Code, §§ 770, 1235.)" (*People v. Ledesma* (2006) 39 Cal.4th 641, 710.) Ordinarily, a witness's inability to remember an event is not inconsistent with that witness's prior statement describing the event. (*Id.* at p. 711.) When, however, "a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219-1220; see *People v. Ledesma*, *supra*, at pp. 711-712.) Here, the trial court expressly found Hall's repeated "I don't recall" claims to be untruthful. The record provides a reasonable basis for that conclusion. Accordingly, admitting Hall's prior statements did not violate state law.

In any event, the jury did not reach a verdict on the charge of soliciting murder, the only charge to which Hall's prior statements related. Accordingly, admitting those statements did not prejudice defendant at the guilt phase.

Next, defendant contends the presentation of the technical evidence violated her confrontation rights. Specifically, she challenges the testimony that

58

the victim's body contained oleander and ethylene glycol, and Dr. Clark's opinion testimony. She did not object at trial. But to the extent defendant contends there was a confrontation clause violation under *Crawford*, *supra*, 541 U.S. 36, and its progeny, we have excused the failure to object in trials that, like this one, predated *Crawford*. (*People v. Pearson* (2013) 56 Cal.4th 393, 461-462.) Accordingly, we will consider defendant's contention on the merits.

The contention lacks merit. Indeed, it is not clear exactly what confrontation defendant claims she was denied. Dr. Birgit Puschner, a toxicologist, performed the tests that showed the victim's body contained oleander; she testified at trial and was subject to cross-examination. (Defendant did not actually cross-examine her, but that does not matter. She had the *opportunity* to cross-examine her. (*Crawford*, *supra*, 541 U.S. at p. 59.)) Dan Anderson, also a toxicologist, and Dr. Chinwah, the pathologist who performed the autopsy, both independently tested and determined that the victim's body contained ethylene glycol; both testified at trial and were subject to cross-examination. And Dr. William Chao, the emergency room doctor who treated the victim on September 7, 2000, testified and was subject to cross-examination. Defendant thus received full confrontation rights as to these witnesses. Dr. Clark, who testified and was subject to cross-examination, based his opinions on the reports of those experts, but, because those experts also testified and were subject to cross-examination, defendant was able to confront all of the experts. A testifying expert may base his or her opinion on hearsay statements, even if testimonial, at least when those who made the hearsay statements also testify and are subject to cross-examination. Defendant received full confrontation rights as to those portions of the reports, if any, that are testimonial under *Crawford*, *supra*, 541 U.S. 36, and its progeny.

One or possibly two exceptions exist.  First, Anderson testified that blood samples from the victim's body had been sent to an independent laboratory, and the laboratory returned a report stating that the samples contained ethylene glycol. We need not determine whether this report was testimonial (see, e.g., *People v. Lopez*, *supra*, 55 Cal.4th 569), because any error in permitting this testimony was harmless.  Anderson also testified that after he received the report, he conducted his own testing and determined himself that the victim's body contained ethylene glycol.  Moreover, Dr. Chinwah testified that he reexamined the body and also determined that the kidneys contained ethylene glycol.  Because of these independent opinions by testifying witnesses on a point defendant did not dispute, Anderson's mention of the original report was harmless beyond a reasonable doubt.  (*People v. Lopez*, *supra*, at p. 585.)

Second, although it is difficult to discern on this record because of the absence of an objection, it is possible that portions of the medical records from the victim's visit to the emergency room about which Dr. Chao (and possibly Dr. Clark) testified were generated by someone other than Dr. Chao, such as nurses. But one of *Crawford*'s progeny makes clear that "medical records created for treatment purposes . . . would not be testimonial under our decision today." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 312, fn. 2.)  The medical records from the victim's emergency room visit were created for treatment purposes, not for some other purpose such as law enforcement.  Defendant was not yet a suspect in a murder that had not yet occurred.  Accordingly, the medical records were not testimonial.

## C. Penalty Issues

### 1. Effect of Asserted Guilt Phase Errors on Penalty Determination

Defendant contends that the asserted guilt phase errors were prejudicial at the penalty phase. However, the only possible guilt phase error that we have identified is the presumed error in permitting the toxicologist, Anderson, to mention the results of the independent laboratory's report finding ethylene glycol in the victim's blood, and that was harmless because Anderson and Dr. Chinwah both independently determined that the victim's body contained ethylene glycol. The presumed error was equally harmless to the penalty determination.

### 2. Issues Concerning the Evidence of Defendant's Prior Murder

Defendant raises several issues concerning the evidence that she murdered her infant daughter.

#### a. Adequacy of the Hearing Regarding the Admissibility of the Evidence

Section 190.3 requires the prosecution to provide the defendant with notice of aggravating evidence it intends to introduce at the penalty phase. The prosecutor's notice of aggravating evidence filed to comply with this section stated the intent to present evidence of, among other matters, defendant's murder of her daughter, Alicia F. In response, defendant moved the court to conduct a "preliminary examination" regarding the admissibility of that evidence. The prosecutor filed an opposition that stated in detail the evidence that defendant murdered her daughter and attached a copy of Dr. Knauss's report.

The court held a hearing before trial. It stated it had read defendant's motion and the prosecutor's response. Defense counsel asked the court to preside over a hearing at which Dr. Knauss testified. The court agreed to do so. Accordingly, Dr. Knauss testified outside the jury's presence, giving testimony consistent with his later testimony before the jury. After hearing Dr. Knauss's

61

testimony and considering arguments from counsel, the court found the evidence that defendant murdered her daughter was sufficient to go to the jury.

Defendant contends the hearing was inadequate. A trial court may "conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity." (*People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25) "[T]his preliminary inquiry is discretionary and, if held, need not be an *evidentiary* hearing. If the court does elect, in its discretion, to conduct such an inquiry it may be based on an offer of proof." (*People v. Jones* (2011) 51 Cal.4th 346, 380.) Here, the trial court did conduct a preliminary inquiry. It read the moving papers and the prosecutor's summary of the evidence, which was in effect an offer of proof, and heard arguments from both sides regarding the strength of the evidence. Additionally, although it did not have to do so (see *People v. Hart* (1999) 20 Cal.4th 546, 649), it required Dr. Knauss to testify both at the preliminary inquiry and again at the penalty phase. This inquiry came well within its discretion.

Defendant contends the court applied the wrong legal standard in finding the evidence sufficient. The record does not support the contention. "Contrary to defendant's urging, the prosecution did not bear the burden at the preliminary inquiry to establish beyond a reasonable doubt that defendant committed a violent crime. The court could accept 'evidence that would allow a rational trier of fact to make a determination beyond a reasonable doubt as to [such] criminal activity.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 449, quoting *People v. Clair* (1992) 2 Cal.4th 629, 676.) The prosecutor cited *Ochoa*, both in its written opposition and at the hearing. Nothing in the record suggests the court applied some different, lower standard.

Moreover, no abuse of discretion in admitting evidence of other crimes will be found if, in fact, the evidence was legally sufficient. (*People v. Whisenhunt*

(2008) 44 Cal.4th 174, 225.)  As we next conclude, the evidence was sufficient to submit the matter to the jury.

### b.  Sufficiency of the Evidence

Defendant contends the evidence was insufficient for the jury to find beyond a reasonable doubt that she murdered her daughter.  Because the question concerns the admissibility of evidence, it also comes within the trial court's discretion.  (*People v. Jones*, *supra*, 51 Cal.4th at p. 380; *People v. Clair*, *supra*, 2 Cal.4th at p. 676.)  We see no abuse of discretion.

There was ample evidence that defendant murdered her daughter.  About two months before Alicia died, defendant took out life insurance on the baby without telling her then husband, the baby's father, and named only herself the primary beneficiary.  This circumstance alone strongly suggests she murdered her daughter to collect the life insurance proceeds, just as she later murdered her husband to collect on a life insurance policy that she insisted he take out.  She was the lone adult in the house when the baby choked to death and, rather than remain with the baby until emergency help arrived, as the jury could reasonably find a mother would normally do, she left the baby inside and met the police outside her house.  After her daughter died, she seemed more concerned about collecting the pacifier parts and suing Gerber than about losing her baby.  Thomas testified that defendant had previously heard about Gerber's recall of the pacifier on which the baby later choked.  Additionally, Dr. Knauss's testimony strongly supported a finding that the baby's death could not have been an accident, especially when combined with defendant's deposition testimony that she continually checked the pacifier by pulling on it.  His opinion was especially credible given that defendant herself had retained him to provide an opinion.  "The foregoing evidence was sufficient to allow a rational trier of fact to determine beyond a reasonable doubt

63

that defendant murdered" her daughter. (*People v. Hart*, *supra*, 20 Cal.4th at p. 650.)

### c. Evidentiary Claims

Defendant contends the court committed several evidentiary errors regarding the evidence that she murdered her daughter.

First, she contends the court erred in admitting evidence of her deposition testimony, apparently on the ground that it was inadmissible hearsay. (See pt. I. B. 1. a., *post.*) However, defendant did not object on this ground so the contention is not cognizable on appeal. (*People v. Partida*, *supra*, 37 Cal.4th at pp. 433-434.)

Defendant contends her attorney was ineffective for not objecting on this ground. However, an objection on hearsay grounds would have been specious. Evidence Code section 1220 makes a "statement" of a party an exception to the general rule forbidding hearsay evidence when the statement is offered against that party. Defendant argues that nothing in her deposition testimony could be considered an "admission." The argument is irrelevant. Although Evidence Code section 1220's exception to the hearsay rule is sometimes referred to an exception for admissions, the exception is not so limited. (*People v. Horning* (2004) 34 Cal.4th 871, 898, fn. 5.) Instead, the exception applies to all statements of the party against whom they are offered. Here, defendant's deposition testimony consisted of statements, defendant made the statements, the statements were offered against her, and she was a party to this action. Thus, the statements came within an exception to the hearsay rule. (*Id.* at p. 898.) They were admissible against defendant.

Next, defendant contends that Dr. Knauss "was permitted to testify beyond the scope of his expertise" both in his initial testimony at the preliminary inquiry and before the jury. She did not object on this ground. Indeed, for purposes of the

64

preliminary inquiry, defense counsel stipulated that Dr. Knauss "is a qualified court expert on the failure of viscous materials, including rubbers." Accordingly, this contention is not cognizable on appeal. (*People v. Partida*, *supra*, 37 Cal.4th at pp. 433-434.) Moreover, the trial court would have had discretion to admit the evidence had defendant objected.

Dr. Knauss was a professor at Caltech and had been since 1965. He received a Ph.D. in aeronautics from Caltech, but "the topic of [his] research has been ever since [his] graduate, student graduate days, failure and fracture of polymers, which includes rubbers." Of his approximately 150-160 publications, about 25-30 percent concerned the fracture of polymers. He had testified in court "as an expert on the failures of rubbers, how rubbers fracture and why they fracture" about 30 times.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Determining whether a witness qualifies as an expert comes within a trial court's discretion. (*People v. Eubanks* (2011) 53 Cal.4th 110, 140.) Given Dr. Knauss's impressive qualifications, the trial court certainly had discretion to permit him to testify as an expert regarding the fracture of rubbers such as the rubber in the pacifier involved in the death of defendant's infant daughter. Defendant cites portions of his testimony, largely on cross-examination, in which, for example, he testified that before he tested the pacifier parts, he had had little or no experience with, specifically, baby pacifiers. But such matters merely go to the weight of Dr. Knauss's testimony, not its admissibility. "Defendant was entitled to attack [the expert's] credibility regarding the claimed basis of [his] opinion, but questions regarding the validity or credibility of an expert's knowledge go to the weight of such testimony, not its admissibility." (*People v. Eubanks*, *supra*, at p. 143.) Dr.

Knauss was an expert on why and how rubbers fracture, so he was entitled to express an opinion regarding whether the actions of a baby could have cause the pacifier at issue to fracture. As in *Eubanks*, defendant was able to question the witness's conclusions and the foundation for his opinions through cross-examination and additionally to present her own expert on the same matter. (*Ibid*.)

Defendant did object to some of Dr. Knauss's testimony at the preliminary inquiry on the ground of lack of foundation, once successfully, other times unsuccessfully. To the extent defendant bases her argument on these objections, the contention is cognizable. But we see no error here either. Over a lack-of-foundation objection, the court permitted the witness to testify that he would not expect a baby's teeth to come into contact with the area where the separation occurred, given how close that place was to the shield, and that it was "not feasible" for a 13-month-old infant with two teeth to have sucked the pacifier apart if it was otherwise intact. The witness explained this opinion in detail, basing it on his experience and his close examination of the pacifier parts. The trial court had discretion to conclude this opinion was sufficiently founded to go to the jury. (*People v. Eubanks*, *supra*, 53 Cal.4th at p. 142.) "When expert opinion is offered, much must be left to the trial court's discretion." (*People v. Carpenter* (1997) 15 Cal.4th 312, 403.)

To the extent defendant argues Dr. Knauss's testimony was not proper opinion because it was based in part on what could be considered common sense or common knowledge, such as his testimony that a baby's teeth would not come into contact with an area of the rubber within a few millimeters of the shield, that too presents no basis to exclude his testimony. Although an expert's opinion testimony is limited "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)), the jury does not have to be wholly ignorant of the opinion's subject

66

matter for it to be admissible. (*People v. Edwards* (2013) 57 Cal.4th 658, 709; *People v. Farnam* (2002) 28 Cal.4th 107, 162-163.) "Here, we cannot say that [the expert's] testimony would not have assisted the jury (Evid. Code, § 801, subd. (a)) or that ' "it would add nothing at all to the jury's common fund of information." ' " (*People v. Farnam*, *supra*, at p. 163.) Expert testimony regarding what does and does not cause rubber to fracture is sufficiently beyond common experience to be admissible even if parts of that testimony refer to matters within common knowledge.

The court properly permitted both Dr. Knauss and Dr. Hamed to testify and let the jury judge who was more credible.

Finally, defendant contends the court erred in not permitting Attorney Novak to provide certain expert opinion testimony. Novak testified outside the jury's presence that, given the large amount of the settlement ($710,000), he did not believe Gerber settled defendant's lawsuit merely for its nuisance value. He did not believe the assessment of nuisance value included potential loss of reputation to the defendant. But he also testified that he had "never worked as a defense lawyer, so I would speculate as to what they do." He had "no information" regarding whether "Gerber had done any projections to see what kind of damage a public trial on this incident might cause to their ability to do business in the baby industry, whether or not they prevailed in the lawsuit." He had "no idea what motivated" Gerber in deciding whether to pursue the lawsuit to its end.

In response to the prosecutor's objection to this opinion testimony, the court expressed this concern: "If the suggestion is or at least with this witness's opinion, Mr. Novak, that this was more than nuisance value, he does not, as I asked him to define it, take into that definition loss of reputation to Gerber Foods. They may well feel that this was a nuisance case, that they could defeat it, but that

in the process they would lose substantial income based on the loss and faith of other customers. So not only as to the pacifier but as to their other products, and he does not know to what extent that calculation would enter into the total value that Gerber agreed would be sufficient to make the case go away." After hearing argument from both sides, the court sustained the prosecutor's objection to the question "whether this witness believes that settlement was more than for nuisance value." It made clear, however, that either side could *argue* to the jury whether the large settlement was merely for nuisance value.

Defendant contends the court erred in not allowing Novak to express his opinion regarding nuisance value. This question, too, comes within the trial court's discretion, reviewed for abuse of that discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) We see no abuse of discretion. Attorney Novak admitted he had never been a civil defense attorney and did not know what factors motivated defendants to settle cases. He did not consider potential loss of reputation in his definition of "nuisance value," but he had no information or expertise to support his apparent assumption that corporate defendants and their attorneys do not do so. Obviously, $710,000 is a lot of money, and defendant could argue to the jury that Gerber did not settle the case for that amount only for its nuisance value. But the trial court had discretion to conclude that Novak had no particular expertise that would assist the jury.

Moreover, whether Gerber settled the lawsuit for more than nuisance value (perhaps suggesting it believed the lawsuit had merit), while probably relevant, was not particularly important. The prosecution's penalty phase case against defendant was very different from the case Gerber faced. When Gerber settled the lawsuit, defendant had not yet murdered her husband to collect on a life insurance policy, a murder that made the earlier death of her insured daughter far more suspicious. The record does not indicate whether Gerber was even aware that

68

defendant had insured the baby's life.  (The trial court sustained defendant's objection to the prosecutor's asking Novak whether Novak was aware of the life insurance policy when he represented defendant.)  Gerber also was unaware of Dr. Knauss's report.  Accordingly, whether Gerber believed the lawsuit it faced was meritorious had little relevance to the jury's determination whether defendant murdered her daughter.  Any error would have been harmless.

### d.  Instructional claims

Defendant contends the court committed two errors in instructing the jury.

First, she argues that if her deposition testimony was only admissible to show "consciousness of guilt," the court erred in failing to so instruct the jury.  However, as discussed above (pt. II. C. 2. c.), her deposition testimony was admissible as an exception to the hearsay rule.  Accordingly, it was not admitted for a limited purpose such as consciousness of guilt, but for any relevant purpose.

Second, defendant contends the court failed to instruct properly regarding the evidence that she murdered her daughter, apparently on the basis that it did not instruct that a juror may consider that evidence only if the juror found beyond a reasonable doubt that she committed the murder.  (See *People v. Robertson* (1982) 33 Cal.3d 21, 53-54.)  However, the court instructed the jury that "evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts:  Murder and solicitation of murder, which involved the express or implied use of force or violence.  Before a juror may consider any criminal act as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit the criminal act.  A juror may not consider any evidence of any other criminal act as an aggravating circumstance."  Immediately thereafter, the court defined

69

reasonable doubt.  Defendant does not explain how these instructions were insufficient.  We see no error.

### 3. Admission of Another Item of Other Crimes Evidence

The prosecution's pretrial notice of aggravating evidence included "defendant's post-arrest solicitation of the murder of and/or assault upon People's witnesses Erlinda Allen and Palmira Gorham."  Some of the taped conversations that the prosecution offered into evidence contain references to Allen (who went by the name "Linda") as well as Gorham.  Defendant objected to the references to Allen.  After reviewing the transcripts, the trial court overruled the objection.  It found the discussion about Allen was "part of the conversation regarding elimination of witnesses.  Even though it's not a charged offense, it does tend to suggest that that's what she intended to do to carry it out."

Accordingly, the jury heard the following.  Erlinda Allen was an inmate whom investigators had interviewed regarding this case.  She had once been housed either with or next to defendant in county jail and later served time at a prison for women in Chowchilla.  In a taped conversation with investigators, Hall said that defendant had told her she had received a letter from Chowchilla. Defendant "want[ed] some people to do somethin' to Linda . . . in prison and stuff like that."  Hall said that someone had told defendant that "when you have drug debts in prison, if you don't pay, they . . . go get somebody blood that's HIV or AIDS positive and shoot you in the back with it.  And that's what she wants somebody to do to Linda."  Hall had the impression that defendant expected that she (Hall) would get some friends to do this.  In a conversation between Hall and defendant recorded on May 10, 2002, defendant said that at Chowchilla, "they have their own system.  They have their own accountability over there.  You know what I mean?"  Later in that conversation, defendant said she had "friends at

Chowchilla." In later conversations between Hall and defendant, defendant referred to getting "those two out of the way" (in context referring to Allen and Gorham), said in reference to Allen that "you know she's playing herself out. Right?" and said that Allen had "already buried herself."

For two reasons, defendant contends the court erred in admitting the evidence. We see no abuse of discretion. (*People v. Jones*, *supra*, 51 Cal.4th at p. 380.)

First, defendant argues that Allen did not actually testify at the trial. While correct, this circumstance makes no difference. Defendant had notice that the prosecution intended to rely on this evidence. Penalty phase evidence of other crimes is not limited to crimes against witnesses who testify at the trial.

Second, defendant contends there was insufficient evidence she committed a qualifying crime against Allen. Only "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" is admissible. (§ 190.3, factor (b).) Evidence under section 190.3, factor (b), is "limited to evidence of conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute." (*People v. Phillips*, *supra*, 41 Cal.3d at p. 72.) Although the evidence regarding defendant's intentions as to Allen was not as compelling as the evidence regarding Gorham, the trial court had discretion to conclude that, in context, a reasonable jury could conclude that defendant's many comments about Allen to Hall constituted the solicitation of a crime of violence against Allen. (§ 653f; see *People v. Wilson* (2005) 36 Cal.4th 309, 328.)

Moreover, any error in this regard would have been harmless. The references to Allen pale in significance compared to the compelling evidence that defendant first sought to dissuade Gorham from testifying and later solicited her murder, and even that evidence was far less aggravating than the circumstances of

71

Frank's murder and the evidence of defendant's earlier murder of her daughter. We see no reasonable possibility the penalty verdict would have been different had the court ordered all references to Allen redacted from the recorded conversations the jury heard. (*People v. McDowell*, *supra*, 54 Cal.4th at p. 434.)

### 4. Asserted Violation of Confrontation Rights

Defendant contends her right to confront witnesses was violated on three occasions at the penalty phase.

First, defendant contends admission of Hall's statements to law enforcement agents prejudiced her at the penalty phase. At defendant's request, during the penalty phase, Hall testified again, this time outside the jury's presence. Again she denied any memory of the conversations regarding this case. The court again found untruthful her claim not to remember. It found no reason, and defendant expressed none, to require her to testify again in front of the jury. Later, the jury heard tape recordings of Hall's conversations with investigators and defendant, authenticated by law enforcement witnesses. As discussed in part II. B. 2. b., *ante*, because Hall testified, defendant's right to confront her was not violated. We see no need for the court to have required her to testify a second time in front of the jury. Defendant had already confronted Hall at the guilt phase and again outside the jury's presence during the penalty phase. She could have but did not ask that Hall testify again in the jury's presence.

Moreover, any error would have been harmless. Defendant's recorded conversations with Hall and her videotaped meeting in jail with Detective Valdez, posing as the fictitious middleman Antonio Davis — evidence presented through witnesses whom defendant confronted — provided far more vivid and convincing evidence of defendant's solicitation of Gorham's murder than Hall's statements to the investigators.

Second, defendant challenges a portion of the testimony regarding the autopsy performed on her daughter, Alicia. Dr. Wallace Carroll testified that he and his staff performed the autopsy. He had "viewed the body and returned for the view of the organs and so forth and reviewed all the dictation and so forth." He testified that Alicia had two teeth when she died, specifically, the two lower front teeth. On cross- and redirect examination, he clarified that Dr. Ducale, an assistant who performed the actual autopsy, had made the observation and recorded the note in the autopsy report regarding the teeth. He did not himself observe the teeth.

Defendant contends that the statements regarding Alicia's teeth were "testimonial" under *Crawford*, *supra*, 541 U.S. 36, and, because she had no opportunity to cross-examine Dr. Ducale, her confrontation rights were violated. She did not object on this basis at trial but, because the trial predated *Crawford*, she may make this argument. (*People v. Pearson*, *supra*, 56 Cal.4th at pp. 461-462.) The contention, however, lacks merit.

Objective observations in an autopsy report, such as the number and location of the decedent's teeth, that are not made with a primary purpose of aiding a criminal investigation, are not testimonial under *Crawford*, *supra*, 541 U.S. 36. (*People v. Edwards*, *supra*, 57 Cal.4th at pp. 704-706; *People v. Dungo* (2012) 55 Cal.4th 608, 619-621; see *Dungo*, at pp. 621-627 (conc. opn. of Werdegar, J.), 629-633 (conc. opn. of Chin, J.).) As we explained in *Dungo*, autopsy reports are used not only for criminal investigation and prosecution but also for other purposes. "For example, the decedent's relatives may use an autopsy report in determining whether to file an action for wrongful death." (*Dungo*, at p. 621.) This example likely applies here. Defendant and her then husband likely used the autopsy report in their wrongful death action against Gerber. In any event, the autopsy report was not prepared with a primary purpose

related to criminal investigation. And certainly Dr. Ducale did not note the number and location of the teeth with the primary purpose to further a criminal investigation. "In summary," to adapt our discussion in *Dungo* to this case, Dr. Carroll's "description to the jury of objective facts about the condition of victim [Alicia's] body, facts he derived from [Dr. Ducale's] autopsy report . . . , did not give defendant a right to confront and cross examine [Dr. Ducale]." (*Ibid.*)

Finally, defendant contends a portion of the prosecution's cross-examination of Dr. Vicary, the psychiatrist who testified on defendant's behalf, violated her right to confront her daughter, Autumn. This issue arose under the following circumstances.

Outside the jury's presence, the prosecutor alerted the court that defendant's attorney had asked him to contact Thomas, Autumn's father and defendant's former husband, to make Autumn available to testify for the defense. The prosecutor said that Thomas had "expressed to me his vehement objection that his daughter be dragged through this in any way." He told Thomas that he would represent "to the court and defense counsel that I would make Autumn available," and that she probably would have to testify. Thomas agreed to bring her to court. The prosecutor also said that if defendant did call Autumn as a witness, "I believe it opens the door to cross-examination of Autumn regarding her role in the death of Frank Rodriguez the night that he died. She gave us a statement the same day that the defendant was arrested wherein she basically told us that there was a special bottle of Gatorade for Frank, that she was not allowed to have any, and that her mother asked her to help feed Frank the Gatorade, and she did in fact help feed Frank the Gatorade the last time he was alive." The prosecutor believed this evidence would be relevant if Autumn testified on defendant's behalf.

The prosecutor later clarified that Autumn had made three statements, all of which he had provided the defense in discovery. The first two were largely

consistent with each other and stated what he had represented. In the third, much more recent, statement, "her story had changed significantly." Because of this change, and because of "concerns about her emotional state being involved as a witness for the prosecution in a death penalty case involving her mother," he had decided not to call Autumn as his own witness. But he argued that, if defendant called her as a witness, he could cross-examine her about her earlier statements and, if necessary, admit them as prior inconsistent statements.

Defense counsel argued that defendant had a right to call Autumn as a witness even over Thomas's objection, and that if Autumn's testimony were narrow enough in scope, the prosecutor should not be allowed to cross-examine her regarding these statements. The court agreed defendant had the right to call Autumn as a witness. It also tentatively indicated that if defendant did call her as a witness, the prosecutor could cross-examine her regarding her prior statement. It agreed, however, to hold a hearing on the question.

The next day, Thomas addressed the court and expressed concerns about Autumn's testifying. While sympathetic with Thomas's concerns, the court ruled that defendant had the right to call her as a witness. The prosecutor stated that if her testimony were limited and not too emotional, he "would refrain, in the interest of [Thomas's] concerns and also concerns I have for Autumn, from going into [her prior statements], although I really want to reserve my final decision until I see just where direct goes."

Autumn then testified very briefly in front of the jury as a defense witness. She said she "would like it for you [the jury] not to execute [defendant] and make it so I can see her." The prosecutor did not cross-examine her.

Later, Dr. Vicary testified for defendant. On direct examination, he said he based his expert opinion on various sources of information, including interviews with defendant, her mother, her sister, and her cousin. Among the many

75

documents he reviewed in forming his opinion was Dr. Romanoff's "very thorough and very lengthy" psychological evaluation of defendant. When asked whether certain factors would prevent defendant from being a loving mother, he responded that he "found her to be the most emotional and the most animated when she was talking about her children. She said in all her life, none of her relationships had ever worked, and that she had only two happy experiences, the birth of her two little girls." History that her relatives supplied indicated that "defendant was a very attentive, loving, supportive mother."

On cross-examination, Dr. Vicary reiterated that he had relied on Dr. Romanoff's evaluation, which was based partly on defendant's own statements. The prosecutor cross-examined Dr. Vicary extensively about this evaluation, including various lies that defendant had told Dr. Romanoff as reported in the evaluation. At one point, the prosecutor asked whether Dr. Romanoff had confronted defendant with a police report that "indicated that her daughter had been interviewed and had told the police that her mother had fed her . . . step-father Gatorade and that she had been told by her mother she couldn't have any of that Gatorade." Dr. Vicary testified that Dr. Romanoff had so confronted defendant. The explanation defendant gave Dr. Romanoff for not letting Autumn have any Gatorade was "because money was so tight and we needed the Gatorade for him." Dr. Vicary agreed that this was another lie that defendant had told Dr. Romanoff.

Later, the prosecutor cross-examined Dr. Vicary regarding his opinion that defendant was a loving mother. He asked whether Dr. Vicary was aware that Autumn had told investigators that the night Frank died, "her mother made him drink a whole bottle of red Gatorade," and that she (Autumn) "had helped her mother feed him the Gatorade." Dr. Vicary answered that he was aware of that and said that defendant's using her nine-year-old daughter as an unwitting

76

accomplice in the murder was a "horrible, indefensible act." However, "considering all the data," this circumstance did not alter his opinion that defendant was a loving and supportive mother.

Defendant contends that the prosecutor's cross-examining Dr. Vicary regarding Autumn's statements violated her right to confront Autumn. Again, she did not object on this basis at trial, but she can argue that the testimony violated her rights under *Crawford*, *supra*, 541 U.S. 36.

If Autumn's statements had been offered and used as substantive evidence for their truth — that is, if the prosecution had used these statements as affirmative evidence to show aggravating circumstances of the crime — state law would clearly have been violated. The statements were hearsay and no exception to the hearsay rule appears. But the prosecutor did not offer or use the statements as substantive evidence but for a nonhearsay purpose that California law has long permitted.

Under state law, an expert such as a psychiatrist may rely on various sources of information, including hearsay, in forming an opinion, and a party may question that expert about that information to test the expert's credibility. "A party 'may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution was entitled to attempt to discredit the expert's opinion. [Citation.] In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence.' " (*People v. Wilson*, *supra*, 36 Cal.4th at p. 358, quoting *People v. Dennis* (1998) 17 Cal.4th 468, 519.) This court explained the reasons for this rule long ago. " ' "Once an expert offers his opinion, however, he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, *the reasons for his opinion including facts and other*

*matters upon which it is based* [citation], and which he took into consideration; and he may be '*subjected to the most rigid cross-examination*' *concerning* his qualifications, and *his opinion and its sources* [citation]." (Italics added.)' " (*People v. Nye* (1969) 71 Cal.2d 356, 374-375.)

The prosecutor used Autumn's statements in cross-examining Dr. Vicary exactly and only as this rule permits. Dr. Vicary based his opinion on many hearsay sources, including interviews with defendant and Dr. Romanoff's evaluation. Under state law, the prosecutor was entitled to explore with Dr. Vicary occasions in which he had reason to believe defendant had lied, to attempt to discredit his reliance on defendant's other statements, and to attempt to discredit Dr. Vicary's opinion that defendant was a loving mother by establishing that he maintained that opinion despite his knowledge of Autumn's statements.

Contrary to defendant's contention, in arguing the case to the jury, the prosecutor cited Autumn's statements only for this nonhearsay purpose. Indeed, at defense request, the court conducted a hearing outside the jury's presence regarding how the prosecutor could discuss Autumn's statements in front of the jury. The prosecutor agreed he could not use these statements as substantive evidence but only to challenge Dr. Vicary's credibility. After this hearing, in argument to the jury, the prosecutor referred to the statements in discussing how much weight the jury should give defendant's evidence in mitigation. Specifically, he argued that Dr. Vicary's opinion that defendant was a good mother should not be credited when he adhered to that opinion despite knowing of Autumn's statements. He did not argue that Autumn's statements constituted substantive evidence of aggravating circumstances of the crime.

The court did not give an instruction limiting the use the jury could make of this cross-examination. Defendant did not request one, and the court has no duty to give a limiting instruction absent a request. (*People v. Maury* (2003) 30 Cal.4th

78

342, 394.) As it was, the jury merely heard a few questions regarding Autumn's statements during a lengthy cross-examination of the defense expert and a brief, limited mention in the prosecutor's argument regarding that expert's credibility. Defense counsel could reasonably not have wanted the court to give a limiting instruction, which might have suggested to the jury that, logically if not legally, the evidence was aggravating.

We need not decide whether and, if so, how *Crawford*, *supra*, 341 U.S. 36, and its progeny have affected the rule permitting cross-examination of experts for this nonhearsay purpose. Under the unusual facts of this case, we see no denial of defendant's opportunity to cross-examine Autumn. Knowing of Autumn's prior statements (and presumably of the rule permitting wide-ranging cross-examination of expert witnesses), defendant called Autumn as her own witness. She had full opportunity to examine her on her statements, either at that time or later. That she did not take advantage of this opportunity is understandable; if she had actually confronted Autumn about the statements, the jury could have considered them for their truth and not merely as they bore on Dr. Vicary's credibility, and the jury would likely have credited them. From defendant's perspective, no doubt, the less said of those statements, the better. But she did have the opportunity to examine Autumn in any way she may have wished.

In any event, any improper use of Autumn's statements would have been harmless. We see no reasonable possibility the jury's penalty decision turned on whether it believed defendant gave Autumn some of the Gatorade to give to Frank. Or, to state the equivalent (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961), any error would have been harmless beyond a reasonable doubt.

## 5. Argument and Instructions Regarding the Mitigating Effect of an Emotional or Mental Disturbance

The trial court instructed the jury regarding the statutory factors it should consider in its penalty determination, including factor (d) of section 190.3: "Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." It also gave the expanded catchall instruction under section 190.3, factor (k), that we recommended in *People v. Easley* (1983) 34 Cal.3d 858, 878, footnote 10. Specifically, it instructed the jury to consider "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which she is on trial."

Defendant contends the court erred in referring to an "extreme" mental or emotional disturbance because the reference prevented the jury from considering a mental or emotional disturbance that was less than extreme. We have repeatedly rejected the contention because the catchall instruction permits the jury to consider *any* evidence the defendant offers in mitigation, including any lesser mental or emotional disturbance. (E.g., *People v. Moore* (2011) 51 Cal.4th 386, 416-417; see *Blystone v. Pennsylvania* (1990) 494 U.S. 299, 308 [upholding a similar Pennsylvania instruction against a similar attack for similar reasons]; *Boyde v. California* (1990) 494 U.S. 370, 381-386 [upholding a catchall instruction arguably narrower than the one given here].)

Defendant argues that the prosecutor's argument to the jury was misleading and made it reasonably likely the jury believed it could not consider in mitigation any mental or emotional disturbance that was less than extreme. We disagree. The prosecutor argued that defendant had presented no evidence of extreme

80

mental or emotional disturbance under section 190.3, factor (d). Indeed, he argued there was no "evidence in this case of any mental disease or intoxication. Dr. Vicary didn't talk to you about any mental disease. He didn't give any clinical diagnosis she was pathological in some sense or psychotic or [had] no impulse control. She has no such mental disease." This was a fair comment on the evidence. "Nothing in the prosecutor's argument or the court's instructions . . . precluded the jury from considering the evidence of defendant's mental impairments, whether under factor (d) (to the extent jurors disagreed with the prosecutor's assessment of the impairments as less than extreme), section 190.3, factor (h) (referring to 'mental disease or defect' as potentially impairing defendant's ability to appreciate the criminality of [her] conduct or conform it to the law's requirements) or the catchall factor (k)." (*People v. Moore*, *supra*, 51 Cal.4th at p. 416.) Indeed, the prosecutor specifically told the jury that under the "catchall provision," it could "consider any other extenuating circumstance that you find to be present in this case."

"As defendant was neither prevented from introducing evidence of mental impairment, nor precluded from arguing its relevance and force as mitigation, or from having it considered as such, we see no infringement on defendant's rights under the Fifth, Sixth, Eighth or Fourteenth Amendment to the United States Constitution." (*People v. Moore*, *supra*, 51 Cal.4th at pp. 416-417.)

### 6. *Denial of the Automatic Motion to Modify the Verdict*

Defendant contends the court erred in denying her automatic motion to modify the jury's verdict of death. "In ruling on defendant's application for modification of the verdict, the trial court must reweigh the evidence; consider the aggravating and mitigating circumstances; and determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict.

81

[Citation.] On appeal, although the trial court's ruling is subject to independent review, we do not make a de novo determination of penalty." (*People v. Brady* (2010) 50 Cal.4th 547, 588.)

Defendant's written motion to modify the verdict contained a supplemental report by Dr. Vicary stating, in part, Dr. Vicary's belief that defendant was genuinely remorseful for the crime. In arguing the motion, defense counsel referred to the report, including its opinion regarding defendant's remorse. The court interjected: "How do you square what the doctor has said, Dr. Vicary's [supplemental] report . . . , where he says the defendant does have remorse for the murder of her husband . . . ? There's been no indication of remorse at all during the trial, and in fact it's hard to believe that there would be any remorse. He was only married for a few months when she created the circumstances under which he received a $250,000 life insurance with her as a beneficiary, and two months after that roughly attempts to kill him through the use of loosening the gas connection, which also endangered not only her husband but also the community around her husband in the event that there had been an explosion, then attempting to poison him with oleander poisoning, and on the failure of that a week later poisoning him for a long period of time with antifreeze. And I have to say it is the coldest killing I've ever seen. Most of the murders, and most of the cases we have are murder cases in this court, over the past 20 years I've never seen a colder heart. She seemed to have no care for the agony that she put her husband through, and the sole goal being to make a profit in his death. So I don't see how the doctor's opinion squares with any of the evidence that I've seen throughout this trial."

After the parties argued the matter, the court permitted defendant to address it personally, and she did so at length. Thereafter, the court denied the motion in a detailed oral ruling that was also memorialized in a written order filed the same day.

Defendant contends the court erred in several regards. Because she failed to object on these — or any — grounds, and because the modification hearing postdated our decision in *People v. Hill* (1992) 3 Cal.4th 959, she has forfeited these claims. (*People v. Brady*, *supra*, 50 Cal.4th at p. 588.) Moreover, the claims lack merit.

Defendant contends "the trial court failed to follow the legal requirements in denying the motion." On the contrary, except possibly by considering Dr. Vicary's supplemental report, it followed the legal requirements precisely. It expressly recognized its duty "to reweigh the evidence of aggravating and mitigating facts and to determine whether in the court's independent judgment the weight of the evidence supports the jury verdict." It "reviewed the testimony presented through an examination of the transcript as well as the court's own extensive notes, has reassessed the credibility of witnesses and evaluated the probative value and force and weight of the evidence and has reviewed the exhibits." It found the prosecution witnesses credible and the proof of defendant's guilt "overwhelming." It also found, under its independent review, that "the jury's implicit finding that the circumstances in aggravation substantially outweigh the circumstances in mitigation, warranting the penalty of death as to defendant Angelina Rodriguez, is overwhelmingly supported by the evidence." It reviewed all of the statutory aggravating and mitigating factors, including the catchall factor provided in section 190.3, factor (k). It concluded: "In reviewing all of the evidence available pursuant to section 190.3 of the Penal Code, and in carefully and separately weighing the aggravating and mitigating factors, this court finds that the aggravating evidence as to defendant Angelina Rodriguez . . . did so substantially outweigh the mitigating evidence that it warrants the imposition of death instead of life without parole as determined by the jury."

It is true, as defendant argues, that the court is supposed to consider only the evidence before the jury. (*People v. Brown* (1993) 6 Cal.4th 322, 337.) But to the extent, if any, the court considered, at defendant's request, Dr. Vicary's belated opinion regarding remorse (to reject that opinion), any error could not have prejudiced defendant. The court considered no other evidence not before the jury.

Defendant contends the court "minimized the mitigating factors or ignored them entirely while exaggerating the aggravating factors and giving them undue weight." It did not do so. It viewed the factors differently than defendant would have it do, but it did consider all the evidence and reached a reasonable conclusion. The court must *consider* all of the evidence, but it need not give any particular weight or, indeed, *any* weight to any particular evidence offered in mitigation. (*People v. Scott* (1997) 15 Cal.4th 1188, 1222.)

It appears that, after engaging in some give and take with defense counsel and defendant, the court read a prewritten ruling denying the motion. Defendant contends this shows the court prejudged its decision and failed to consider the arguments at the hearing. "We disagree. The practice of formulating tentative rulings in advance of argument and reducing those tentative rulings to writing is commonplace and unobjectionable. [Citing *People v. Hayes* (1990) 52 Cal.3d 577, 644-645.] . . . 'To do so does not mean that the court is unalterably bound by the writing or that it will not amend or even discard the writing if counsel's arguments persuade the court that its tentative views were incorrect. Nothing in the record indicates that the trial court failed to give due consideration to defense counsel's argument at the hearing.' (*Id*. at p. 645.)" (*People v. Medina* (1995) 11 Cal.4th 694, 783.) The court apparently wanted to ensure that *if* it denied the motion, it did so without inadvertently omitting any of the technical requirements. (See *People v. Seaton* (2001) 26 Cal.4th 598, 696.)

Defendant also contends the court's comments when defense counsel cited Dr. Vicary's supplemental report showed it improperly considered her lack of remorse as an aggravating factor. However, those comments showed only that it rejected defendant's claim of remorse as a mitigating factor, not that it considered lack of remorse in aggravation. Moreover, the court could properly have considered in aggravation the facts it cited. The court did not cite defendant's mere failure to express remorse; it cited her actions showing *overt* remorselessness at or near the time of the crime, a proper aggravating circumstance. "Overt remorselessness *is* a *statutory* sentencing factor in that context, because factor (a) of section 190.3 allows the sentencer to evaluate *all aggravating and mitigating aspects* of the *capital crime itself*. Moreover, there is nothing inherent in the issue of remorse which makes it mitigating only. The defendant's overt indifference or callousness toward his misdeed bears significantly on the moral decision whether a greater punishment, rather than a lesser, should be imposed. [Citation.] [¶] On the other hand, *postcrime* evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1232; see *People v. Cain* (1995) 10 Cal.4th 1, 77 ["From the evidence that defendant, still bloody from the killings, returned to his friends and boasted of what he had just done, the jury could infer his attitude during the crimes was one of callousness towards the victims."].)

Here, the court cited defendant's *actions*, rather than mere words. After defendant tried to kill her husband by loosening the gas valves, she tried a second time, giving him enough oleander to send him to the emergency room. Her husband became very ill but did not die. Rather than feel remorse for what she put him through, she tried a third time, this time giving him several times the amount of poison (both oleander and antifreeze) needed to kill him. These actions overtly

showed this was truly a remorseless murder or, as the court put it, among the "coldest" of killings. These were relevant aggravating circumstances of the crime.

The court properly denied the motion to modify the verdict.

### 7. Other Contentions

Defendant makes several other contentions, most of which we have repeatedly rejected. We see no reason to reconsider our previous decisions.

Except regarding evidence of other crimes, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; except for the verdict itself, the jury need not achieve unanimity; and the jury need not make written findings. (*People v. Rountree* (2013) 56 Cal.4th 823, 862.) "CALJIC No. 8.88's use of the words 'so substantial,' its use of the word 'warrants' instead of 'appropriate,' its failure to instruct the jury that a sentence of life is mandatory if mitigation outweighs aggravation, and its failure to instruct the jury on a 'presumption of life' does not render the instruction invalid." (*Id*. at pp. 862-863.) "Intercase proportionality review is not required." (*Id*. at p. 862.)[7] " 'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' " (*Rountree*, at p. 863.)

---

[7] We do provide *intracase* proportionality review. (*People v. Rountree*, *supra*, 56 Cal.4th at p. 860.) Defendant does not specifically request such review, but it would not aid her. She murdered her husband by poisoning him on her third attempt to collect on a life insurance policy she insisted he take out, then tried to dissuade a witness from testifying and later solicited that witness's murder. The jury could reasonably have found that several years earlier, defendant similarly murdered her infant daughter to collect on another life insurance policy she had taken out on that daughter. The sentence of death is not disproportionate to defendant's personal culpability. It does not shock the conscience. (*People v. Rountree*, *supra*, at p. 862.)

Contrary to defendant's argument, the cumulative effect of the asserted errors does not require reversal of the death judgment. Defendant argues that we should excuse any failure by defense counsel to object to any jury instruction. We have found no instructional claim forfeited. She also argues that "this court should review all errors on the merits, rather than invoking procedural bars, because death is the ultimate penalty." However, procedural rules, such as the statutory requirement that a party object to evidence at trial in order to challenge its admissibility on appeal (Evid. Code, § 353), apply to capital cases as well as other cases. (*People v. Richardson* (2008) 43 Cal.4th 959, 984, fn. 11.)

Finally, "Defendant asks that we deem incorporated by reference any argument [she] has raised in [her] petition for habeas corpus but which, in reviewing that petition, we may decide should have been raised on appeal. We decline to do so. The rules of court do not permit such incorporation. [Citation.] Moreover, 'habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction.'" (*People v. Richardson, supra*, 43 Cal.4th at p. 1038.)

### III. CONCLUSION

We affirm the judgment.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rodriguez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S122123
**Date Filed:** February 20, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** William Pounders

_____

**Counsel:**

Karen Kelly, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Karen Kelly
P.O. Box 6308
Modesto, CA 95357
(209) 552-0988

William H. Shin
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2038