Filed 2/10/21  P. v. Davityan CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NAREK DAVITYAN,<br><br>    Defendant and Appellant. | B298328<br><br>(Los Angeles County<br>Super. Ct. No. BA467707) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Norman Shapiro, Judge.  Affirmed.

Lori A. Quick, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kim Aarons and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Narek Davityan pleaded guilty to running a chop shop and, as a felon, to possessing three guns.  The court sentenced him to two years in prison.  Davityan appeals the trial court's order denying his motion to relieve his appointed defense attorney Nicholas Okorocha.  (See *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).)

We review this issue for abuse of discretion.  (*People v. Rodriguez* (2014) 58 Cal.4th 587, 623 (*Rodriguez*).)

Davityan asked for a *Marsden* hearing and the court promptly complied.  The court asked Davityan what the problem was.  Davityan expressed some particular dissatisfactions.  When his account got a bit off track, the court said, "Well, we're not dealing with that.  We're dealing with the *Marsden* situation, and why you think that you'd rather not have this counsel."

Davityan explained he had many disagreements with his lawyer.  He said he and his lawyer were "not on good terms exactly."  Davityan said he had taken many notes but the lawyer "didn't want those notes."  Further, the lawyer "failed to retrieve the . . . discovery we needed for the case."

When Davityan paused, the court said, "Go ahead."

Davityan continued, explaining it seemed like his lawyer was avoiding him "like, lunch time and prior to that; prior to lunch time."

The court said, "All right.  Anything further?"

Davityan continued.  He said his lawyer incorrectly informed him the return of a search warrant on his property accurately listed what the police had taken.  This was wrong, Davityan said, because the police "actually had taken a lot more things . . . ."

The court said, "Anything else?"

Davityan said, "I guess that may be it."

The court said, "I want you to tell me why you feel you were not represented by counsel."

Davityan said, "Like, he just, he didn't agree with everything, like anything and everything, you know?  Like, I gave him numerous, you know, scenarios and possibilities.  And he just didn't want to even, you know—he did push it off on the investigator."

Davityan also complained he did not get a chance to review discovery.

The court said, "All right.  Anything else?"

Davityan said, "I believe that might be it."

The court summarized the gist of Davityan's complaints, one by one, and asked Davityan's lawyer to respond.

The attorney did respond.  He said, "Regarding the meeting, Mr. Davityan and I met for three solid hours; went through all of the discovery.  Went through his views of—regarding what motions should be filed, regarding his views of what, what the facts were.  [¶]  And, and he provided some, some information regarding essentially what he viewed as some grand conspiracy against him.  I addressed all of his, his concerns.  [¶]  Before the meeting was up, I'd say probably the last hour of it was repeating things that we had discussed during the initial two hours.  [¶]  Prior to the meeting, Mr. Davityan had uploaded his prior motions, notes, documents, photos, links to Google Maps, research he had done; that sort of thing.  He had uploaded numerous files and documents onto a Dropbox link.  [¶]  Before our meeting, I reviewed all of it.  I saw all of his prior motions.  I saw his notes.  I saw everything he had uploaded, and I did all that in preparation for our meeting.  [¶]  So, by the time our

meeting was done, we had discussed everything numerous times."

The attorney explained his reasoning for a series of tactical legal decisions.

The attorney agreed there were some "[d]isagreements we had," but said "we didn't end every conversation abruptly. There were probably two or three [times] where I told him we were done talking because all we are doing is going round and round in circles with regard to conspiracy theories he had come up with."

The attorney described some of these theories: animal control officers were trying to get a search warrant to take his dogs away; police told people to make up a story about a chop shop to get a warrant; a coffee shop manager across the street was involved; a police officer came onto his property, "chitchatted" about a car, and was "perhaps doing something sneaky." Davityan told the attorney a girl whose name was Alexis or Annette or "started with an 'M'" had let a gang member bring cars to the property, but Davityan would not give the gang member's name. Davityan claimed he had an ex-girlfriend that could be an alibi witness, but he wouldn't give his attorney her name either.

The lawyer explained he asked Davityan to give the information to the private investigator on the case but that Davityan "did not arrange a meeting with [the private investigator] in any sort of timely fashion."

"I didn't avoid him on the day of the trial. I, I handled a couple other appearances, but I did not tell him that that we were going to be going through his file of paperwork. That's just absolute nonsense. [¶] I had probably exchanged many, 200

emails with Mr. Davityan, and probably a hundred phone calls. [¶] It's outlandish the amount of conversations we've had."

The lawyer told the court a problem with Davityan's case is Davityan knew he had guns registered to him in his home while he had a prior felony conviction. "That's the reason he decided to accept the plea."

"And this nonsense about, about me doing anything improper, is similar to what he said about his prior felony and his attorney in that case; that he was forced to plea[d] and coerced to take a plea and all this. It is, it is deceptive. He lied in his *Marsden* motion. It's absolute nonsense. We've had a ton of communication. Reviewed everything he had. He had massive factual problems, and he took the two year deal because he wanted to avoid the risk of getting a whole lot more time."

The court said, "Very simply stated, the record fails to demonstrate the continued representation by Mr. Okorocha would deprive Mr. Davityan of representation in this matter. [¶] Your motion pursuant to the *Marsden* matter is denied."

When defendants seek new court-appointed counsel on the basis of poor representation, the court must permit them to explain their logic and to give specific examples. The court must appoint a new lawyer if it is clear the current representation is inadequate or if an irreconcilable attorney/client conflict makes effective representation unlikely. (*Rodriguez, supra*, 58 Cal.4th at p. 623.)

Davityan says the court applied the wrong legal standard by saying it would have to find Davityan was "without counsel." Davityan argues this is an unnecessarily high standard and is contrary to law. He contends the proper standard is whether the right to counsel was "substantially impaired."

There was no error here under any standard. The court had an accurate grasp of the proper legal standard. Courts need not parrot language word for word. The court was polite and attentive and gave Davityan ample opportunity to explain his grievances. Davityan's attorney then thoroughly rebutted Davityan's factual presentation. The court obviously accepted the attorney's version, which was detailed and logical. That was not an error or an abuse of discretion.

Davityan devoted five sentences to arguing his relationship with his lawyer had so broken down as to jeopardize his right to effective assistance of counsel.

This lawyer and client did not have a perfect relationship, but there was no sign the lawyer's performance was amiss.

Davityan says three phrases his lawyer used are damning. We examine each one and conclude these arguments lack support.

First, the lawyer said Davityan provided "some information regarding essentially what he viewed as some grand conspiracy against him." The lawyer explained Davityan's theories about the animal control officers, the coffee shop manager across the street, and the police officer who had said something about a Toyota 4runner. Davityan's briefing to us makes no attempt to explain the logic of these theories or to show why it is unfair, excessive, or inaccurate to call them conspiracy theories.

Second, the lawyer described one of Davityan's claims as "absolute nonsense." This claim was that the lawyer told Davityan they would sit down before a court appearance and in the court hallway the two of them would go through all the evidence. At least, this apparently is Davityan's meaning; we are unsure, because Davityan's opening brief devotes little attention

6

to describing his meaning.  The lawyer rejected Davityan's factual assertion in strong terms.  Davityan does not explain why this rejection was incorrect or why the strength of the rejection was unwarranted.

Third, Davityan points to his lawyer's description of 200 emails and 100 phone calls as an "outlandish" number of conversations between client and counsel.  Davityan does not contest these quantitative sums.  Nor does he explain why his lawyer's description is factually inaccurate.  The fact the lawyer and client had communicated extensively about the case is not evidence of a breakdown in their relationship.

In short, there was no error or abuse of discretion.

We do not reach the issues of whether Davityan had to get a certificate of probable cause or whether there was prejudice.

## DISPOSITION

The judgment is affirmed.


WILEY, J.


We concur:


GRIMES, Acting P. J.


STRATTON, J.

7